IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EVELYN CARRION,

    Plaintiff,

                                            3:14-CV-454-PK

v.                                          OPINION AND ORDER

KEEN, INC.,

    Defendant.

PAPAK, Magistrate Judge:

    Plaintiff Evelyn Carrion filed this action against her former employer, defendant Keen, Inc., on March 20, 2014. Carrion worked for Keen from June 2011 until the termination of her employment effective March 8, 2013. Carrion alleges Keen's liability in connection with the termination of her employment for (i) retaliation for opposing unlawful conduct under both Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-3(a) and Oregon's employment discrimination laws, Or. Rev. Stat. 659A.030(1)(f); (ii) interference with protected medical leave under both 29 U.S.C. § 2615(a) and Or. Rev. Stat. 659A.183(2); (iii) failure to restore her to her position of employment following medical leave under both 29 U.S.C. § 2614 and Or. Rev. Stat.

659A.171(1); (iv) retaliation for whistleblowing under Or. Rev. Stat. 659A.199 and 230; and (v) wrongful discharge under Oregon common law. This court has subject-matter jurisdiction over Carrion's federal claims pursuant to 28 U.S.C. § 1331, and may properly exercise supplemental jurisdiction over her state claims pursuant to 28 U.S.C. § 1367.

Now before the court is Carrion's motion (#22) to compel Keen to produce documents in discovery. I have considered the motion, oral argument on behalf of the parties, and all of the pleadings and papers on file. For the reasons set forth below, Carrion's motion is granted in part and denied in part as discussed below.

## LEGAL STANDARDS

### I. Scope of Permissible Discovery, Generally

Federal Civil Procedure Rule 26(b)(1) provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense – including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter." Fed. R. Civ. P. 26(b)(1). The Rule specifies that "[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* However, the district courts should limit the scope of discovery under specified circumstances, as follows:

> On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:
>
> > (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;

>   (ii) the party seeking discovery has had ample opportunity to obtain the
>   information by discovery in the action; or
>
>   (iii) the burden or expense of the proposed discovery outweighs its likely benefit,
>   considering the needs of the case, the amount in controversy, the parties'
>   resources, the importance of the issues at stake in the action, and the importance
>   of the discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(C).

## II.   Motion to Compel

As noted above, Federal Civil Procedure Rule 26(b)(1) authorizes discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party. Rule 26(b)(1) is to be construed broadly, and encompasses any matter that bears on, or that reasonably could lead to other matters that would bear on, any issue that is or may be in the case. *See, e.g., Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 351 n. 12 (1978).

If a party elects to oppose a propounding party's discovery requests, the opposing party bears the burden of establishing that the discovery is overly broad, unduly burdensome or not relevant. *See Graham v. Casey's General Stores*, 206 F.R.D. 251, 253-4 (S.D. Ind. 2000). "Boilerplate, generalized objections are inadequate and tantamount to not making any objection at all." *Walker v. Lakewood Condominium Owners Assoc.*, 186 F.R.D. 584, 587 (C.D. Cal. 1999); *see also Farber and Partners, Inc. v. Garber*, 234 F.R.D. 186 (C.D. Cal. 2006).

Federal Civil Procedure Rule 37(a)(3)(B) empowers a propounding party to "move for an order compelling an answer, designation, production, or inspection" if:

>   (i) a deponent fails to answer a question asked under Rules 30 or 31;
>
>   (ii) a corporation or other entity fails to make a designation under Rule 30(b)(6) or
>   31(a)(4);

Page 3 - OPINION AND ORDER

>   (iii) a party fails to answer an interrogatory submitted under Rule 33, or
>
>   (iv) a party fails to respond that inspection will be permitted — or fails to permit inspection — as requested under Rule 34.

Fed. R. Civ. Pro. 37(a)(3)(B). Moreover, Rule 37(a)(4) provides that "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(4). Rule 26 provides that "[f]or good cause, the court may order discovery of any matter relevant to the subject matter involved in the action." Fed. R. Civ. Pro. 26(b)(1).

## FACTUAL BACKGROUND

### I. History of the Parties' Dispute[1]

Keen hired Carrion as its Human Resources Manager in June 2011. Carrion alleges that in April 2012, Keen transferred Carrion to the position of Talent Manager, with responsibility for recruiting new employees, although it appears that Keen may take the position that Carrion continued to serve as Keen's Human Resources Manager during the entire tenure of her employment. Carrion remained employed by Keen as either its Human Resources Manager or its Talent Manager until the termination of her employment effective March 8, 2013.

On August 9, 2012, Carrion, Keen CEO Rory Fuerst, Carrion's supervisor Shannon Corbin, and Keen in-house counsel Jennifer Yruegas received an anonymous email message setting forth allegations of workplace sexual harassment by Keen's Director of Footwear Development, Chadd Garvens, and allegations of otherwise harassing behavior by Keen's Vice President of Product, Kelly Wallrich. According to evidence proffered by Keen, the text of the anonymous message was as follows:

---

[1] Except where otherwise indicated, the following recitation constitutes my construal of Carrion's allegations in support of her claims.

Page 4 - OPINION AND ORDER

> We have decided to come out of the shadows and out from under the intimidation, threats and fear of Chadd Garvens and kelly Wallrich. We have lived with their abuse, [Garvens'] sexual harassment and both of their creating a hostile work environment and [Wallrich] at times putting our health at risk.
>
> For years and affecting past and current employees both, [Garvens] has continuously sexually harassed the female employees in product. He has made sexual comments, engaged in inappropriate touching and sexually propositioned the females of this team while we traveled with him in China. He engaged in position [sic] while we traveled with him often commenting on how he hoped we did not hear him through the walls with his many prostitutes. During our first trips with [Garvens] over to china he would give us a note with a checklist asking questions like "what color panties do you prefer". When his advances were not reciprocated we each became the victims of his authority, making us look bad taking credit for our work and continuously harassing us and making our work environment unbearable, leading to some people quitting and others to think or look for new positions.
>
> [Garvens] often makes sexual comments about what we wear and even tries to get us to take part in activities that would lead to touching like asking one of us to measure his in seam, over and over again. He asks us whether we've had sex recently and other wrong questions.
>
> [Garvens] has never been reported because his boss [Wallrich] has made it clear that we can't go to HR and that if we did she would find out and she'd never trust us or be able to work with someone who went over her head. These are quotes from [Wallrich\] "We keep it all in product" "We never use HR they aren't going to keep your confidence" "I know about everything said to HR" "[Fuerst] hates employees who go to HR" "No one who's gone to HR has ever lasted at KEEN".
>
> In fact [Wallrich] brags about her power over HR. We believe what she says because she gets away with crazy stuff. She makes us pray or engage in GOD is good discussions. She hires people based on whether they go to her church or a church. She's allowed to ask questions in interviews like "are you married, are you looking to be with someone" "She will tell the young interns oh your [sic] so cute, even yummy." Then there's here [sic] normal and daily abuse and meanness toward her team. Making comments on how we dress, telling us we aren't pretty enough, smart enough, fast enough. She jeopardizes our work by not listening to our concerns on designs and developments and then when things go bad she blames use [sic] and not herself. One of us had a serious health issue DVT and [Wallrich] and [Garvens] said that we shouldn't tell HR and that the travel schedule could not be adjusted because [Fuerst] would get mad. She said that if any complaints were made and this was backed up in a later conversation by

Page 5 - OPINION AND ORDER

> [Garvens] that if HR were told or it got out that person who complained jobs [sic] would be at risk. In this company it is clear who holds the power and it has been [Wallrich] and she fully supports [Garvens] even when it's at risk to the company and its business and products.
>
> Why are we talking now because its [sic] gotten worse, because we are ready to quit, because [Wallrich] is more abusive and authoritative than ever and because [Garvens] is continuing his sexual actions. This issue spans years and current and past employees. We've wanted to report but we feared the consequences. In talking with some former employees we believe they did report [garvens'] sexual advances to [Wallrich] but she did nothing except to tell them to keep quite [sic] and she protected [Garvens] and forced them out. [Wallrich's] personality and treatment is well know [sic] throughout the industry and in the Portland area, she and [Garvens] are an obstacle to local recruitment.
>
> We hope now that its [sic] out you will do what's right and ask the questions and get the information necessary to help us. All the women in product know about [Garvens'] abuse and some of the guys who've traveled with him know about his prostitution issues and all the employees working for [Wallrich] can attest to her actions and words.

Upon receipt of the anonymous message, Corbin directed Carrion to determine the identity of the message's author, indicating that she believed the author might be Keen employee Michelle Callan (identified in Carrion's complaint and discovery requests as "Michelle Callahan" and in the briefing in support of her motion as "Michelle Callan"). Keen retained the services of an outside attorney, Amy Hartman, to conduct interviews of selected Keen employees, including Callan, regarding the allegations. According to Hartman's declaration testimony, following the conclusion of her investigation, Keen "separated" Garvens and Wallrich "from Keen."[2]

On August 15, 2012, following the "separat[ion]" of Garvens and Wallrich from Keen, a

---

[2] The precise implications of the phrase "separated from Keen" are unclear on the current evidentiary record. Evidence proffered by Keen strongly suggests that "separat[ion] does not imply the termination of either Keen executive's employment, and that the term may instead imply that the two executives were transferred to a corporate parent, subsidiary, or sibling of Keen, Inc.

Page 6 - OPINION AND ORDER

second anonymous email message was sent to the same persons who had received the anonymous message of August 9, 2012. According to evidence proffered by Keen, the anonymous message of August 15, 2012, stated as follows:

> You aren't done. There is more information to be had about both [Wallrich] and [Garvens]. You were told all women in product. You are missing a big portion of information – unless you really aren't after all of the truth because it will require real action.
>
> Disappointed and fearful.

According to evidence proffered by Keen, two days later, on August 17, 2012, the author of the messages of August 9 and 15, 2012, anonymously forwarded the entirety of both previous messages to Fuerst's three children, together with the following additional text:

> We are forwarding you a document sent to your dad.
>
> Do you know this is happening? Putting your family name and business at risk?
>
> What does [Wallrich] have on your dad how does she keep her job and protect [Garvens].
>
> She's got them to stop even looking into this not talking to the other woman who [Garvens] has made sexual advances to because they don't want to know what he's done to us all trying to get one woman to touch his penis by having her measure his inseam to fit him for the new pants. It really is bad in product working for [Wallrich] and being subjected to [Garvens].
>
> We sent the below complaint to your dad hr and lawyer and we think nothing is happening. That just makes people question the relationship [Wallrich] has with [Fuerst].
>
> [Wallrich] went around yesterday telling us that everything will be back to normal soon and that [Garvens] isn't going anywhere because [Fuerst] loves her and has listened to her. She told us there's lots of change coming with Phyliss leaving at the end of the month but her and [Garvens] will always be at [K]een. She's saying it's just [Callan] causing problems but this isn't just [Callan]'s story or Erin's or Layli's or Katrina or Joan's or Lori's it's all of us and the men too feel that [K]een has great potential out from under the sadist [Wallrich] and sexually sick

> [Garvens]. We just want to feel safe and for the company to do well.
>
> We don't understand why someone with such a successful company would risk it for two people who aren't really going to further the business but put it at risk. We believed [Wallrich]'s control could be overcome with facts and the legal risk but maybe not.

The anonymous message of August 17, 2012, was not sent to any Keen employee, and Carrion did not at any material time see the message, although she testifies that it was described to her by Corbin.

In October 2012, Keen hired a private investigator, Mike Kaighan, to determine the author of the anonymous messages. Keen executives misrepresented to most non-managerial Keen employees that Kaighan had been hired to perform a "cultural assessment" of Keen's workplace. Corbin conceded to Carrion that the true purpose of Kaighan's retention was to identify the employee who had sent the three anonymous email messages, including the message sent to members of Fuerst's family. Kaighan interviewed select Keen employees, including Callan.

Shortly following the conclusion of Kaighan's investigation, Corbin advised Carrion that Keen founder and Chief Executive Officer Rory Fuerst had decided to terminate Callan's employment on the grounds that Callan had breached a duty of confidentiality in connection with Kaighan's investigation. Corbin directed Carrion to effect Callan's termination. Carrion refused to do so on the grounds that she believed the proposed termination of Callan's employment would be retaliatory and unlawful.

On November 15, 2012, Corbin issued a "Corrective Action notice" to Carrion in connection with her refusal to effect Callan's termination. Carrion protested the corrective

action, taking the position that it was motivated by retaliatory animus for her refusal to effect Callan's termination.

On or around November 19, 2012, Carrion approached a medical care provider complaining of severe anxiety and stress. On November 19, 2012, Carrion applied for protected medical leave under the federal Family and Medical Leave Act and the Oregon Family Leave Act in connection with those symptoms. On December 6, 2012, Carrion's medical care provider recommended that Carrion be relieved of employment duties due to her anxiety and stress. Carrion provided documentation of her provider's recommendation to Keen that same day.

On December 18, 2012, Keen approved Carrion's request for protected medical leave, but advised her that upon her return to the workplace she would be offered only her previous position as Keen's Human Resources Manager, and would not be returned to her most recently held position as Keen's Talent Manager. Carrion protested that condition upon her return to work.

On February 26, 2013, Carrion received a release for return to work on an intermittent leave schedule and a certification of fitness for duty for the Talent Manager position from her medical care provider. Keen's General Counsel, Tim Naylor, refused to accept the certification of fitness and demanded that Carrion seek such a certification from a medical care provider of Keen's choosing. Carrion protested that requirement. On March 3, 2013, Carrion advised Naylor that she intended to return to work the following day in her previous position of Talent Manager. Naylor at first reiterated that she would not be permitted to return to work absent a fitness certification from Keen's chosen provider, then indicated that an additional fitness certification would not be required, but that Carrion would be permitted to return only to the position of Human Resources Manager. Carrion responded that she would file a claim with the Oregon

Page 9 - OPINION AND ORDER

Bureau of Labor and Industries, Civil Rights Division, regarding Keen's possible violation of her rights to protected medical leave. On March 8, 2013, Naylor advised Carrion that Keen was terminating her employment, effective immediately.

Prior to filing this action, Carrion filed charges of unlawful employment practices with the Oregon Bureau of Labor and Industries, Civil Rights Division and complaints with the Equal Employment Opportunity Commission in satisfaction of the administrative prerequisites to filing employment discrimination claims. This action was filed March 20, 2014.

## II. Material Procedural History

On May 23, 2014, Carrion served Keen with, *inter alia*, a set of requests for production of documents. Keen responded to Carrion's requests on July 17, 2014, largely refusing to provide documents in response to the discovery requests that are the subject of Carrion's motion. The parties conferred regarding Keen's objections to Carrion's requests in November 2012, and again in January 2015 following this court's order (#21) of January 14, 2015, that (*inter alia*) Keen produce Kaighan for deposition. Those efforts having failed to resolve the parties' discovery dispute, tis motion followed.

## ANALYSIS

Carrion challenges Keen's refusal to provide documents in response to her Requests for Production Nos. 4, 5, 9-11, and 23. Those requests, and Keen's responses thereto, are set forth below.

> **REQUEST FOR PRODUCTION NO. 4:** All documents and electronic communications between or among defendant, defendant's employees, or defendant's agents relating to allegations of sexual harassment and/or misconduct committed by Keen's Vice President of Product, Wallrich, or Director of Footwear, Garvens.

Page 10 - OPINION AND ORDER

**RESPONSE:**
Defendant objects to this request as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery relevant or admissible evidence. Defendant further objects to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine. Subject to and without waiving its objections, defendant will produce non-privileged correspondence concerning plaintiff's refusal to participate in an investigation into allegations of sexual harassment and/or misconduct by Kelly Wallrich and Chadd garvens that can be located with a reasonably diligent search.

**REQUEST FOR PRODUCTION NO. 5:** All documents and electronic communications that mention or discuss both Michelle [Callan] and sexual harassment allegations between July 1, 2012 through the present.

**RESPONSE:**
Defendant objects to this request as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery relevant or admissible evidence. Defendant further objects to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine. Subject to and without waiving its objections, defendant will produce non-privileged correspondence concerning plaintiff's refusal to assist with Michelle Callan's termination that can be located with a reasonably diligent search.

\* \* \*

**REQUEST FOR PRODUCTION NO. 9:** All documents and electronic communications relating to allegations of sexual harassment and/or misconduct committed by Wallrich or Garvens between or among any two or more of the following: (1) attorney Hartman; (2) the corporate investigator; (3) Rory Fuerst; (4) General Counsel Naylor; (5) Shannon Corbin; (6) Wallrich; (7) Garvens; and (8) defendant, defendant employees or agents; including but not limited to any documentary findings of fact or conclusions made by attorney Hartman and/or the corporate investigator.

**RESPONSE:**
Defendant objects to this request as vague in its reference to the "corporate investigator," overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery relevant or admissible evidence. Defendant further objects to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine. Subject to and without waiving its objections, defendant refers to and incorporates its response to Request No. 4.

**REQUEST FOR PRODUCTION NO. 10:** Documents identifying the

employees interviewed for purposes of the investigation of sexual harassment or misconduct by Wallrich and Garvens.

**RESPONSE:**

Defendant objects to this request as not reasonably calculated to lead to the discovery relevant or admissible evidence. Defendant further objects to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine. Subject to and without waiving its objections, defendant refers to and incorporates its response to Request No. 4.

**REQUEST FOR PRODUCTION NO. 11:** All documents and electronic communications regarding, comprising, or relating to statements, conclusions, observations, remarks, or comments provided by the individuals interviewed during the investigation of sexual harassment by Wallrich and Garvens.

**RESPONSE:**

Defendant objects to the term "relating to" as vague, and therefore unduly burdensome, and further objects to this request as not reasonably calculated to lead to the discovery relevant or admissible evidence. Defendant further objects to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine. Subject to and without waiving its objections, defendant refers to and incorporates its response to Request No. 4.

\* \* \*

**REQUEST FOR PRODUCTION NO. 23:** All documents and electronic communications relating to Michelle [Callan's] termination, including but not limited to all documents relating to [Callan's] purported breach of confidentiality.

**RESPONSE:**

Defendant objects to this request as not reasonably calculated to lead to the discovery relevant or admissible evidence. Defendant further objects to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine. Subject to and without waiving its objections, defendant refers to and incorporates its response to Request No. 5.

Carrion takes the position that she is entitled to production of all non-privileged documents and communications responsive to each of the six requests at issue because they will necessarily bear on the question whether Carrion's refusal to effect Callan's termination was factually justified, which in turn is relevant to the material questions whether Keen in

consequence harbored retaliatory or other discriminatory animus against her and whether the grounds proffered for the corrective action of November 15, 2012, were pretextual. In addition, Carrion asserts that the documents and electronic communications identifying the Keen employees interviewed in the course of the investigation conducted by Kaighan and relating to the testimony provided by those interviewees are necessary for Carrion to prepare for the upcoming deposition of Kaighan.

Keen argues that the factual justification (or lack thereof) of Carrion's refusal to participate in Callan's termination is necessarily immaterial to any issue raised by Carrion's claims to the extent not known to her at the time the refusal occurred. Because, Keen argues, all information Carrion contemporaneously possessed regarding the motivation underlying Callan's employment was information she gleaned from verbal communications with Corbin, no document or textual communication can have any relevance to her contemporaneous mental state, and therefore to issues raised by her claims. On that basis, Keen argues by and through its opposition memorandum that no document or communication responsive to any of the discovery requests at issue could be relevant to any issue raised by any of Carrion's claims.

Notwithstanding that argument, at oral argument in connection with Carrion's motion counsel for Keen expressly acknowledged that it reserves the right to present and likely will present at trial, in support of its asserted defenses to Carrion's claims, documents and communications relating to Callan's termination, as well as documents and communications relating to the anonymous allegations and to the Hartman and Kaighan investigations to the extent those documents tend to support the conclusion that Callan's termination was not motivated by improper discriminatory or retaliatory animus. That acknowledgment amounts to a

Page 13 - OPINION AND ORDER

clear concession that such documents and communications are of clear relevance to Keen's defenses to Carrion's claims. Moreover, such documents and communications are, additionally, of potential relevance to Keen's intent in connection with Carrion's own termination. By contrast, to the extent responsive documents and communications do not relate to Callan's termination, to the grounds therefor, or to the identity of the author of the anonymous messages, but rather relate solely to the factual basis of the anonymous author's accusations of improper workplace conduct, I agree with Keen that they are immaterial to Carrion's claims and Keen's defenses.

In light of the foregoing analysis, Carrion's motion to compel is granted in part and denied in part as follows. Keen is ordered to produce all non-privileged documents and communications responsive to Carrion's Request for Production No. 23 and to produce all non-privileged documents and communications responsive to Carrion's Requests for Production Nos. 4, 5, and 9-11 to the extent such documents and communications relate to (i) Callan's termination, (ii) to the grounds therefor or to Callan's conduct purportedly constituting such grounds, (iii) to the suspicion, if any, of any Keen employee or person retained by Keen to conduct an investigation on Keen's behalf that Callan was the author of the anonymous messages of August 9, 15, and 17, 2012, or (iv) to questions posed, information uncovered, or conclusions reached in the course of or following either the Hartman investigation or the Kaighan investigation regarding either the identity of the author of the anonymous messages or the question whether Callan could be the author. Keen need not produce responsive documents or communications that relate solely to the accuracy of the anonymous allegations of improper workplace behavior by Garvens or Wallrich. To the extent Keen withholds documents or communications from production on the basis of

Page 14 - OPINION AND ORDER

privilege, it shall provide Carrion with a privilege log describing each such document, its contents, the date on which it was created, the identity of its author, the privilege pursuant to which it is withheld from production, and Keen's basis for asserting such privilege in sufficient detail to permit Carrion and/or the court fairly to evaluate the merits of the assertion.

## CONCLUSION

For the reasons set forth above, Carrion's motion (#22) to compel production of documents is granted in part and denied in part as discussed above, and Keen is ordered to produce non-privileged, responsive documents as discussed above within fourteen days of the date hereof.

Dated this 11th day of February, 2015.

*Paul Papak*
Honorable Paul Papak
United States Magistrate Judge

Page 15 - OPINION AND ORDER