IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EVELYN CARRION,

        Plaintiff,

                                      3:14-CV-454-PK

v.

                                      FINDINGS AND
                                      RECOMMENDATION

KEEN, INC.,

        Defendant.

PAPAK, Magistrate Judge:

        Plaintiff Evelyn Carrion filed this action against her former employer, defendant Keen,

Inc. ("Keen"), on March 20, 2014. Carrion worked for Keen from June 2011 until the

termination of her employment effective March 8, 2013. Carrion alleges Keen's liability in

connection with the termination of her employment for (i) retaliation for opposing unlawful

conduct under both Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-3(a), and Oregon's

employment discrimination laws, Or. Rev. Stat. 659A.030(1)(f); (ii) interference with protected

medical leave under both the federal Family and Medical Leave Act (the "FMLA"), 29 U.S.C. §

2615(a), and the Oregon Family Leave Act ("OFLA"), Or. Rev. Stat. 659A.183(2); (iii) failure to

Page 1 - FINDINGS AND RECOMMENDATION

restore her to her position of employment following medical leave under both the FMLA, 29

U.S.C. § 2614 and OFLA, Or. Rev. Stat. 659A.171(1); (iv) retaliation for whistleblowing under

Or. Rev. Stat. 659A.199 and 230; and (v) wrongful discharge under Oregon common law.

Carrion seeks injunctive relief to enjoin Keen from future unlawful conduct of the kind upon

which her claims are premised, monetary damages for her past and future economic losses, non-

economic damages, punitive damages, liquidated damages, award of her attorney fees, and both

pre- and post-judgment interest.  This court has subject-matter jurisdiction over Carrion's claims

to the extent premised on the violation of federal statutory law pursuant to 28 U.S.C. § 1331, and

may properly exercise supplemental jurisdiction over her claims to the extent premised on state

law pursuant to 28 U.S.C. § 1367.

Now before the court is Keen's motion (#48) for partial summary judgment, by and

through which Keen seeks summary adjudication in its favor of Carrion's first (state and federal

opposition retaliation), third (state and federal failure to restore), and fourth (state whistle-blower

retaliation) claims for relief, and of a portion of Carrion's fifth (common law wrongful discharge)

claim for relief.  I have considered the motion, oral argument on behalf of the parties, and all of

the pleadings and papers on file.  For the reasons set forth below, Keen's motion should be

granted in part and denied in part as discussed below.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a).  A party taking the position that a material fact either "cannot be or is genuinely disputed"

must support that position either by citation to specific evidence of record "including depositions,

documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," by showing that the evidence of record does not establish either the presence or absence of such a dispute, or by showing that an opposing party is unable to produce sufficient admissible evidence to establish the presence or absence of such a dispute. Fed. R. Civ. P. 56(c). The substantive law governing a claim or defense determines whether a fact is material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).

Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## MATERIAL FACTS

### I.    The Parties

Plaintiff Carrion is an individual resident of Oregon formerly employed by defendant Keen. Keen is a corporate entity engaged in the business of designing, manufacturing, and selling footwear, is incorporated under the laws of the state of California, and is headquartered in Portland, Oregon.

## II.    The Parties' Dispute[1]

Keen offered Carrion a position as its U.S. Human Resources Manager working out of its

Portland, Oregon, headquarters by and through a written letter dated May 20, 2011. *See*

Deposition of Evelyn Carrion ("Carrion Depo."), Exh. 42. The offer letter of May 20, 2011,

expressly "supersede[d] any prior representations or agreements, whether written or oral." *Id.*

The offer letter expressly stated that Carrion's employment at Keen would be at will – that is,

terminable by either party at any time with or without cause – and that its provisions to that effect

constituted the parties' "full and complete agreement . . . on th[at] term." *Id.* The offer letter

expressly provided that "[a]lthough [Carrion's] job duties, title, compensation, [and] benefits or

[Keen]'s policies, practices and procedures [could] change from time to time, the 'at-will' nature

of [her] employment [could] only be changed in an express writing signed by [Carrion] and

[Keen]." *Id.* The offer letter further provided as follows:

> This letter forms the complete and exclusive statement of [Carrion's] employment
> agreement with KEEN (hereinafter Employment Agreement). The Employment
> Agreement terms set forth in this letter supersede any other agreements or
> promises made to [Carrion] by anyone, whether oral or written. This Employment
> Agreement cannot be changed except in a writing signed by [Carrion] and a duly
> authorized officer of [Keen].

*Id.* Carrion signed the offer letter on June 23, 2011, *see id.*, *see also id.* at 27:8-16, although she

started work at Keen in the Human Resources Manager position as of June 13, 2011, *see id.*,

44:4-7; *id.*, Exh. 44 at 1.

While she was in the Human Resources Manager position at Keen, Carrion was

---

[1] Except where otherwise indicated, the following recitation constitutes my construal of
the evidentiary record in light of the legal standard governing motions for summary judgment
under Federal Civil Procedure Rule 56.

responsible for job duties including recruiting, performance management, employee relations, employee discipline and termination, and employee benefits, *see id.* at 38:13 – 40:8, *id.*, Exh. 54, and for assisting Keen in complying with applicable employment and/or wage and hour law, *see id.*, Exh. 54., Declaration of Shannon Corbin ("Corbin Decl."), ¶ 6.  The parties vigorously dispute whether Carrion remained in the Human Resources Manager position until the termination of her employment effective March 8, 2013, or whether Keen moved Carrion to the position of Talent Manager at some time in 2012.

When Carrion was first hired, she reported to Keen's Global Human Resources Director, Kate Lee. *See* Carrion Depo., 44:4-7; *id.*, Exh. 44 at 1.  On August 9, 2011, Lee's employment with Keen terminated, and Carrion began reporting directly to Keen CEO James Curleigh. *See id.*  In April 2012, Curleigh stepped down from his position as Keen Ceo and was replaced by Keen co-founder Rory Fuerst. *See id.*  At that time Carrion began reporting to Shannon Corbin, the head of human resources for Keen's parent company, who was based in California but traveled frequently to Oregon. *See* Corbin Decl., ¶¶ 1-4.

At some time in or around early 2012, Keen management began discussing a reorganization of Keen's human resources department, a reorganization that was contemplated to include the creation of a new position, to be designated "Talent Manager," which would report to another new position, to be designated either "Senior Human Resources Manager" or "Director of Human Resources." Corbin Decl., ¶ 27; *see also id.*, Exh. 9; *see also* Deposition of Shannon Corbin ("Corbin Depo."), Exhs. 7, 8.  It was contemplated that the Talent Manager position would focus on recruitment of new employees and on development and training of existing employees, and would not entail duties relating to employee discipline or termination or

employment-law compliance. *See* Corbin Decl., Exh. 9; Corbin Depo., Exh. 8; Carrion Depo. 38:10 – 40:8. In April 2012, Corbin told Carrion that she believed Carrion would be more successful in the role of Talent Manager than in her role as Human Resources Manager. *See* Carrion Depo., 31:20 – 32:13. In late June 2012, Corbin left Carrion a voice message to advise her that she had spoken with senior Keen management, including Rory Fuerst and Keen consultant Robin Smith, regarding the possible reorganization, and that Fuerst and Smith were "open to the creation of a Talent Management role and moving [Carrion] into that." *Id.* at 68:16 – 70:9. On June 26, 2012, Corbin sent Carrion an email message attaching a draft job description for the Talent Manager position, characterized by Corbin as "[Carrion's] new position" without qualification, as well as a draft organization chart reflecting where the Talent Manager role would fall in the hierarchy of what Corbin characterized as "the future org[anizational] set up of Keen HR." Corbin Decl., Exh. 9; Corbin Depo., Exh. 8.

Keen hired Sarah Outlaw to fill the new human resources generalist position described in the draft organizational chart on July 9, 2012. *See* Declaration of Shelley D. Russell ("Russell Decl."), Exh. B at KEEN001713.

On August 9, 2012, Carrion, Keen CEO Rory Fuerst, Carrion's supervisor Shannon Corbin, and Keen in-house counsel Jennifer Yruegas received an anonymous email message setting forth allegations of workplace sexual harassment by Keen's Director of Footwear Development, Chadd Garvens, and allegations of otherwise harassing behavior by Keen's Vice President of Product, Kelly Wallrich. *See* Corbin Decl., Exh. 1. The anonymous message stated as follows:

We have decided to come out of the shadows and out from under the intimidation,

threats and fear of Chadd Garvens and Kelly Wallrich. We have lived with their abuse, [Garvens'] sexual harassment and both of their creating a hostile work environment and [Wallrich] at times putting our health at risk.

For years and affecting past and current employees both, [Garvens] has continuously sexually harassed the female employees in product. He has made sexual comments, engaged in inappropriate touching and sexually propositioned the females of this team while we traveled with him in China. He engaged in position [*sic*] while we traveled with him often commenting on how he hoped we did not hear him through the walls with his many prostitutes. During our first trips with [Garvens] over to china he would give us a note with a checklist asking questions like "what color panties do you prefer". When his advances were not reciprocated we each became the victims of his authority, making us look bad taking credit for our work and continuously harassing us and making our work environment unbearable, leading to some people quitting and others to think or look for new positions.

[Garvens] often makes sexual comments about what we wear and even tries to get us to take part in activities that would lead to touching like asking one of us to measure his in seam, over and over again. He asks us whether we've had sex recently and other wrong questions.

[Garvens] has never been reported because his boss [Wallrich] has made it clear that we can't go to HR and that if we did she would find out and she'd never trust us or be able to work with someone who went over her head. These are quotes from [Wallrich\] "We keep it all in product" "We never use HR they aren't going to keep your confidence" "I know about everything said to HR" "[Fuerst] hates employees who go to HR" "No one who's gone to HR has ever lasted at KEEN".

In fact [Wallrich] brags about her power over HR. We believe what she says because she gets away with crazy stuff. She makes us pray or engage in GOD is good discussions. She hires people based on whether they go to her church or a church. She's allowed to ask questions in interviews like "are you married, are you looking to be with someone" "She will tell the young interns oh your [*sic*] so cute, even yummy." Then there's here [*sic*] normal and daily abuse and meanness toward her team. Making comments on how we dress, telling us we aren't pretty enough, smart enough, fast enough. She jeopardizes our work by not listening to our concerns on designs and developments and then when things go bad she blames use [*sic*] and not herself. One of us had a serious health issue DVT and [Wallrich] and [Garvens] said that we shouldn't tell HR and that the travel schedule could not be adjusted because [Fuerst] would get mad. She said that if any complaints were made and this was backed up in a later conversation by [Garvens] that if HR were told or it got out that person who complained jobs [*sic*]

would be at risk. In this company it is clear who holds the power and it has been [Wallrich] and she fully supports [Garvens] even when it's at risk to the company and its business and products.

Why are we talking now because its [sic] gotten worse, because we are ready to quit, because [Wallrich] is more abusive and authoritative than ever and because [Garvens] is continuing his sexual actions. This issue spans years and current and past employees. We've wanted to report but we feared the consequences. In talking with some former employees we believe they did report [garvens'] sexual advances to [Wallrich] but she did nothing except to tell them to keep quite [sic] and she protected [Garvens] and forced them out. [Wallrich's] personality and treatment is well know [sic] throughout the industry and in the Portland area, she and [Garvens] are an obstacle to local recruitment.

We hope now that its [sic] out you will do what's right and ask the questions and get the information necessary to help us. All the women in product know about [Garvens'] abuse and some of the guys who've traveled with him know about his prostitution issues and all the employees working for [Wallrich] can attest to her actions and words.

*Id.* Upon receipt of the anonymous message, Keen retained the services of an outside attorney, Amy Hartman, to conduct interviews of selected Keen employees in an effort to conduct a "privileged investigation" of the allegations made in the anonymous message. Corbin Decl., ¶ 8; *see also* Declaration of Amy Hartman ("Hartman Decl."), ¶ 3. Keen executives instructed all employees to maintain the details of Hartman's investigation and of the anonymous email messages strictly confidential. *See* Corbin Decl., ¶¶ 9, 17. According to Hartman's declaration testimony, following the conclusion of her investigation, Keen "separated" Garvens and Wallrich "from Keen."[2] Hartman Decl., ¶ 7.

On August 15, 2012, Corbin presented at a meeting of Keen's board of directors. *See*

---

[2] It appears to be undisputed that the phrase "separated from Keen" does not imply the termination of either Keen executive's employment, but rather that the two executives were transferred to a corporate parent, subsidiary, or sibling of Keen, Inc., where their duties were modified. *See* Carrion Depo., 44:4-7; *id.*, Exh. 44 at 3.

Page 8 - FINDINGS AND RECOMMENDATION

Corbin Decl., ¶ 29; *id.*, Exh. 10. The minutes of that meeting state that Corbin "reviewed the past and current HR structure at Keen, including the move of Evelyn Carrion to company recruiter." *Id.*, Exh. 10. The minutes themselves do not clarify whether such "move" was a proposal or an accomplished fact. *See id.* To the extent the move was proposed rather than accomplished, the portion of the minutes offered into evidence does not suggest that the board took any action on the proposal. *See id.* The minutes state that during the course of Corbin's presentation "Mr. Smith recommended hiring a contract recruiter as soon as possible to get ahead at Keen." *Id.* Smith later testified that the minutes reflecting discussion of "the move of Evelyn Carrion to company recruiter" "must have" referred to discussion of the "possibility" that Carrion would become a company recruiter. Deposition of Robin Smith ("Smith Depo."), 36:8 – 37:13.

Also on August 15, 2012, a second anonymous email message was sent to the same persons who had received the anonymous message of August 9, 2012. *See* Corbin Decl., Exh. 3. The anonymous message of August 15, 2012, stated as follows:

> You aren't done. There is more information to be had about both [Wallrich] and [Garvens]. You were told all women in product. You are missing a big portion of information – unless you really aren't after all of the truth because it will require real action.

> Disappointed and fearful.

*Id.* Two days later, on August 17, 2012, the author of the messages of August 9 and 15, 2012, anonymously forwarded the entirety of both previous messages to Fuerst's three children, together with the following additional text:

> We are forwarding you a document sent to your dad.

> Do you know this is happening? Putting your family name and business at risk?

Page 9 - FINDINGS AND RECOMMENDATION

What does [Wallrich] have on your dad how does she keep her job and protect [Garvens].

She's got them to stop even looking into this not talking to the other woman who [Garvens] has made sexual advances to because they don't want to know what he's done to us all trying to get one woman to touch his penis by having her measure his inseam to fit him for the new pants.  It really is bad in product working for [Wallrich] and being subjected to [Garvens].

We sent the below complaint to your dad hr and lawyer and we think nothing is happening.  That just makes people question the relationship [Wallrich] has with [Fuerst].

[Wallrich] went around yesterday telling us that everything will be back to normal soon and that [Garvens] isn't going anywhere because [Fuerst] loves her and has listened to her.  She told us there's lots of change coming with Phyliss leaving at the end of the month but her and [Garvens] will always be at [K]een.  She's saying it's just [Callan] causing problems but this isn't just [Callan]'s story or Erin's or Layli's or Katrina or Joan's or Lori's it's all of us and the men too feel that [K]een has great potential out from under the sadist [Wallrich] and sexually sick [Garvens].  We just  want to feel safe and for the company to do well.

We don't understand why someone with such a successful company would risk it for two people who aren't really going to further the business but put it at risk. We believed [Wallrich]'s control could be overcome with facts and the legal risk but maybe not.

Corbin Decl., Exh. 4.  The anonymous message of August 17, 2012, was not sent to any Keen

employee, and Carrion did not at any material time see that message, although it was described to

her by Corbin.  Carrion Depo., 66:7-12.

In connection with a relocation of certain Keen personnel to a new building, Keen

determined in August 2012 that it would provide new business cards to affected employees.

Those employees included Carrion.  On August 20, 2012, Carrion was sent a proof of her

proposed new business cards; the business card proof stated her title as "Human Resources

Manager."  Corbin Decl., Exh. 11.  On August 23, 2012, Carrion forwarded the proof to Corbin,

asking "Should I have the new tit[]le on these Business Cards?" *Id.*, Exh. 12. Corbin replied with the single word "Yes." *Id.*

Carrion followed up with the further inquiry "When do I expect to sign my new offer?" to which Corbin responded "I would think we would make this change via an ECS, unless you intend to resign?" *Id.* Carrion responded with the further inquiry "Resign from what?" to which Corbin responded "Your current job... call me or skype, this could get lost in translation, or we can talk when I'm in P[ortland] Tuesday." *Id.* Carrion never followed up on the inquiry. *Id.* at ¶ 31. It appears that Carrion ultimately ordered business cards bearing the title Talent Manager, although Keen management may not have immediately been aware that she did so. *See* Russell Decl., Exh. B at KEEN000936.

On September 16, 2012, Corbin wrote an email message to Fuerst and Smith to reaffirm her belief that the role of Talent Manager needed to be filled, and to indicate that, given the (entirely unspecified) "current feedback" regarding Carrion, she was looking at alternative candidates to fill that role, and not solely at Carrion. *See* Deposition of Rory Fuerst ("Fuerst Depo."), Exh. 4; Corbin Decl., ¶ 32; Corbin Decl., Exh. 13.

On September 24, 2012, Fuerst received an anonymous message via facsimile, apparently from a person other than the author of the anonymous e-mail messages of August 9, 15, and 17, 2012. *See* Corbin Decl., ¶ 14; Corbin Decl., Exh. 5. The author of the message of September 24, 2012, asserted that Keen employee Christa Depoe had bragged openly in the workplace about successfully causing Wallrich and Garvens to be separated from Keen and had indicated her intent to procure the terminations of additional members of Keen management, including John Jansen and a manager identified as "Pat." *See* Corbin Decl., Exh. 5. The author of the

anonymous message of September 24, 2012, further reported hearing office gossip to the effect

that Depoe had arranged the separation of Wallrich from Keen in order to conduct or attempt to

conduct an affair with Fuerst. *See id.* The contents of the faxed message, if presumed to be

accurate, would suggest the likelihood that Depoe was the author of the three anonymous email

messages of August 2012. It appears that the author of the anonymous message of September 24,

2012, may have been unaware that Depoe's supposed communications with Fuerst regarding

Wallrich and Garvens had been made by and through anonymous email messages. *See id.*

In early October 2012, Keen hired Chad Scott to serve in its newly created position of

Senior Human Resources Manager. *See* Deposition of Sarah Outlaw ("Outlaw Depo."), 15:12-

13, 40:7-12; Corbin Depo. 67:7 – 68:2; Corbin Decl., ¶ 34; Carrion Depo., 44:4-7; *id.*, Exh. 44 at

4. It was the understanding of both Carrion and Outlaw that at or around the time Scott was

hired into the Senior Human Resources Manager, Carrion was affirmatively moved into the

position of Talent Manager, and both Carrion and Outlaw testify that Corbin expressly so advised

them at the time the change in job title and job duties occurred. *See* Carrion Depo., 30:23 – 31:3,

72:1 – 73:4; Outlaw Depo., 15:13-16, 33:12 – 34:25, 37:10-13, 45:22-24, 54:12-15. Carrion

further testifies that Corbin additionally announced the change in her position to Keen

executives, but to no other Keen employees, at about this same time. *See* Carrion Depo. 30:15-

22, 40:10 – 41:1, 72:3-18. In addition, Carrion testifies that shortly after the Keen executives

returned from their retreat at which Corbin announced the change in her position from Human

Resources Manager to Talent Manager, Keen executive Ron Hill congratulated her regarding the

change in her job title and job duties. *See* Carrion Depo., 44:4-7; *id.*, Exh. 44 at 4.

By contrast with the unequivocal testimony of Carrion and Outlaw, it is Corbin's equally

unequivocal testimony that at all times in and prior to December 2012 (when Corbin left the

employ of Keen's parent company), "Carrion held only one job title: HR manager" and that "she

never held any other titles at KEEN." Corbin Decl., ¶ 5. It appears undisputed that there was

never any announcement or notification by any Keen employee, including Carrion, to Keen

employees generally that Carrion's job title and job duties had changed at this or any other time.

Indeed, Corbin testified that she herself "would have had to approve any change to [Carrion's]

job title" and that she "never approved [such] a change" or "approve[d] any paperwork

confirming [such] a change." *Id.* at ¶ 33.

As noted above, the job description for the Talent Manager position included

responsibilities for recruitment of new employees and for the development of existing

employees, and did not include responsibilities for employee discipline or termination, and

moreover did not include responsibility for "other duties as assigned" as did the Human

Resources Manager position. *See* Corbin Decl., Exh. 9; Corbin Depo., Exh. 8; Carrion Depo.

38:10 – 40:8; Outlaw Depo. 33:2-7. Carrion viewed the shift to Talent Manager as a demotion,

because although her pay and benefits remained unchanged, her responsibilities in the new role

were reduced by comparison to the responsibilities she had in her former role as Human

Resources Manager. Carrion Depo. 38:2-8.

Keen terminated Scott's employment on or around October 8, 2012, after he had worked

as Keen's Senior Human Resources Manager for only one week. *See* Carrion Depo. 70:18 –

71:1, 71:16-25; Outlaw Depo. 15:12-13, 15:16-19, 37:10-11. It was the express understanding of

Carrion and Outlaw that notwithstanding Scott's termination, Carrion continued to serve Keen as

its Talent Manager. *See* Carrion Depo. 112:4-8, 112:18-23, 113:19-20; Outlaw Depo. 15:16-19,

Page 13 - FINDINGS AND RECOMMENDATION

123:2-6.

In or around late October 2012, Keen hired a private investigator, Mike Kaighan, to determine the author of the anonymous messages, in particular the anonymous message of August 17, 2012, that had been sent to Fuerst's children. *See* Corbin Decl., ¶ 15; Carrion Depo., 68:11 – 70:17. Keen executives misrepresented to most non-managerial Keen employees that Kaighan had been hired to perform a "cultural assessment" of Keen's workplace. Carrion Depo., 70:3-12. Following Kaighan's investigation, Corbin conceded to Carrion that the true purpose of Kaighan's retention had been to identify the employee who had sent the three anonymous email messages of August 2012, including in particular the message sent to members of Fuerst's family. *See id.*

During the course of his investigation, Kaighan interviewed select Keen employees, including, among others, Carrion and Keen employee Michelle Callan. *See* Carrion Depo., 68:11 – 69:17; Corbin Decl., ¶ 16. Although Keen management had instructed all interviewed employees to maintain the strict confidentiality of all information regarding the Hartman investigation and/or the anonymous email messages of August 2012, *See* Corbin Decl., ¶¶ 9, 17, Callan conceded to Kaighan during her interview that she had disclosed details of the Hartman investigation to other Keen employees, *see* Corbin Decl., ¶ 16. Kaighan thereupon brought Corbin into the Callan interview to serve as a witness, and in Corbin's presence Callan repeated her statement that she had openly discussed details of the Hartman investigation with other Keen employees. *See id.*

It is Corbin's understanding that the Kaighan investigation concluded with no ultimate determination of the identity of the author of the anonymous email messages of August 2012.

Page 14 - FINDINGS AND RECOMMENDATION

*See id.*, ¶ 15.  Corbin contemporaneously communicated that understanding to Carrion.  *See* Carrion Depo., 69:18 - 70:2.  Nevertheless, Carrion believed that Fuerst and perhaps Corbin believed that Callan had been the author of the anonymous messages.  *See* Carrion Depo. 82:1-5, 88:1 – 88:9.  Carrion's explanation of the grounds for her belief that Fuerst thought Callan had authored the anonymous email messages is that Corbin had told her following the Hartman investigation, but prior to the Kaighan investigation, that Fuerst wanted to terminate Callan, but that Corbin had advised him not to do so because to do so would create the appearance of retaliation.  *See id.* at 88:2 – 89:9.

Shortly following the conclusion of Kaighan's investigation in early November 2012, Corbin advised Carrion that Keen founder and Chief Executive Officer Rory Fuerst had decided to terminate Callan's employment on the grounds that Callan had breached a duty of confidentiality in connection with the Hartman investigation.  *See* Carrion Depo., 81:11-17.  The parties do not agree precisely as to what next transpired.

Carrion testifies that Corbin "asked [her], 'Are you comfortable doing the termination?'" and that she replied that she was not, because she was no longer the Human Resources Manager and because she believed the proposed termination of Callan's employment would be retaliatory and unlawful.  *See id.* at 81:18 – 82:9.  The record does not contain evidence suggesting that Corbin took immediate issue with Carrion's claim, if made as described in Carrion's testimony, that she was no longer working in the Human Resources Manager position.  According to Carrion's account of events, she offered to serve as a witness to the termination, but expressed discomfort with having any greater involvement in effecting the termination.  *See id.*

Keen proffers Corbin's slightly different account.  Corbin testifies that she merely

requested that Carrion be present while Hill effected the termination, and that Carrion refused even to be present because to do so would make her uncomfortable. *See* Corbin Decl., ¶ 18.

The parties agree that, ultimately, Hill effected the Callan termination with Corbin present telephonically, and without Carrion's presence or direct involvement. *See* Carrion Depo., 83:25 – 84:25; Corbin Decl., ¶ 19.

Following what Keen characterizes as Carrion's refusal to effect the Callan termination, on November 5, 2012, Fuerst, Smith, and Corbin discussed the option of terminating Carrion's employment, but ultimately decided to issue a write-up or corrective action rather than terminate her. *See* Fuerst Depo., Exh. 2. This decision was made at least in part on the theory that Carrion might resign if presented with a sufficiently strongly worded corrective action, obviating the need for affirmative termination. *See id.*

On November 15, 2012, Corbin issued a "Corrective Action notice" to Carrion in connection with her refusal to effect Callan's termination. *See* Carrion Depo., 89:14 – 93:1; Carrion Depo., Exh. 49; Corbin Decl. ¶ 20; Corbin Decl. Exh. 6. The Corrective Action notice repeatedly (and for the first time since September or October 2012) characterized Carrion's job position as that of Human Resources Manager, and took Carrion to task for not fulfilling the responsibilities of that role. *See* Carrion Depo., Exh. 49; Corbin Decl. Exh. 6. Specifically, the Corrective Action characterized Carrion's "immediate refusal to support Ron Hill in the termination of Michelle Callan" as "insubordinate and wholly inappropriate." Carrion Depo., Exh. 49; Corbin Decl. Exh. 6. The Corrective Action further charged Carrion with responsibility for the purported fact that "[Keen] was forced to bear the expense of flying [Corbin] to Portland to assist with a termination that should have been within [Carrion's] core competencies," Carrion

Page 16 - FINDINGS AND RECOMMENDATION

Depo., Exh. 49; Corbin Decl. Exh. 6, notwithstanding the testimony of both Corbin and Carrion

that Corbin had not in fact flown to Portland for the Callan termination but rather had been

present only telephonically, *see* Corbin Decl., ¶ 19, Carrion Depo., 83:25 – 84:25.  The

Corrective Action notice of November 15, 2012, did not follow the standard template for such

notices then in use at Keen, and Outlaw testifies that it was the only such notice she ever saw at

Keen that did not follow that template.  *See* Outlaw Depo., 111:14-18.

      Carrion attended work the following day, a Friday.  *See* Carrion Depo., 93:2-15.  On

Monday November 19, 2012, Carrion approached a medical care provider complaining of severe

anxiety and stress, and on that same day applied for protected medical leave under the federal

Family and Medical Leave Act and the Oregon Family Leave Act in connection with those

symptoms.  *See* Corbin Decl., ¶ 23; Corbin Decl., Exh,. 7; Carrion Depo. 108:1-13; Carrion

Depo., Exh. 51.  Also on that same day, Outlaw sent Carrion a letter requesting that she provide a

certification of her claimed symptoms within fifteen days.  *See* Russell Decl., Exh. B at

KEEN000929.  It appears that also on or around that same day, Carrion made a written internal

complaint that she had been discriminated against at Keen based on her national origin, sexual

orientation, family relationships, and status as a whistle-blower, and that Keen had violated her

right to privacy on several occasions.  *See id.* at KEEN000939.

      On November 26, 2012, Carrion protested the Corrective Action notice in writing, taking

the position that it was factually inaccurate in that she was Keen's Talent Manager rather than its

Human Resources Manager, and as such had no responsibility to effect employee discipline or

terminations, and additionally taking the position that it was motivated by retaliatory animus for

her refusal to effect Callan's termination.  *See* Carrion Depo. 96:18-22; Corbin Decl., ¶¶ 24-25;

Page 17 - FINDINGS AND RECOMMENDATION

Corbin Decl., Exh. 8.

On December 5, 2012, Outlaw asked Corbin via email who should be signing off on new hires, noting that Carrion had handled such matters previously, when she had still been in the Human Resources Manager role. *See* Outlaw Depo., Exh. 2. Corbin responded on December 6, 2012, with the inquiry "When was it that [Carrion] first informed you that she was no longer your Manager or the HR Manager at KEEN? The company has not approved any change in title or responsibilities for [Carrion]. Please continue to provide this information to her. Hope this helps." *Id.* Outlaw responded that it had been Corbin herself who had advised Outlaw, in connection with the hiring of Scott to fill the role of Senior Human Resources Manager in October 2012, that Carrion would serve as Talent Manager and would report to Scott. *See id.* It does not appear that Corbin responded further. Outlaw testifies that the email exchange of December 6, 2012, was the first occasion upon which she realized that Corbin did not understand Carrion's role to have been that of Talent Manager during the previous several months. *See* Outlaw Depo., 44:24 – 45:14.

On December 7, 2012, Smith asked for Corbin's resignation from Keen. *See* Corbin Depo., 98:23-25.

It appears that Keen approved Carrion's request for protected medical leave on or around December 7, 2012. *See* Deposition of Timothy Naylor ("Naylor Depo."), Exh. 32; *see also* Russell Decl., Exh. B at KEEN000941. Initially, Keen granted Carrion's request through December 31, 2012, specifically conditioning her return to work on Keen's receipt of a health-care provider's certification of Carrion's fitness to return to the job duties of a Human Resources Manager. *See* Naylor Depo., Exhs. 30, 32; *see also* Russell Decl., Exh. B at KEEN000941.

Page 18 - FINDINGS AND RECOMMENDATION

On December 10, 2012, Corbin tendered her resignation from Keen in response to Smith's request, with Corbin and Keen apparently mutually agreeing that she would continue working at Keen through approximately the end of December 2012. *See* Corbin Depo., 98:11-22.

On December 11, 2012, Carrion requested that Keen direct all further communications to her to her counsel. *See* Russell Decl., Exh. B at KEEN000941.

On December 18, 2012, Keen sent Carrion's counsel a fitness-for-duty certification and a job description for the position of Human Resources Manager. *See* Russell Decl., Exh. B at KEEN000941. The certification form had Keen's job description for the Human Resources Manager position "copied and pasted" into it, requiring the health care provider entering information into the form to certify Carrion's fitness specifically for those job duties. *See* Outlaw Depo., 50:2-11; Carrion Depo., 44:4-7; *id.*, Exh. 44 at 8. This was not the standard practice at Keen in connection with FMLA/OFLA leave of absence, where the focus of the fitness inquiry had always previously been on the employee's medical fitness to return to the work environment. *See* Carrion Depo., 44:4-7; *id.*, Exh. 44 at 8.

On December 19, 2012, Carrion's counsel wrote to Corbin to advise her that Carrion's last-held position at Keen was that of Talent Manager, and not that of Human Resources Manager. *See* Naylor Depo., Exh. 30. Corbin responded to Carrion's counsel that Keen's records indicated that Carrion had last served Keen as its Human Resources Manager. *See id.* On December 31, 2012, Carrion advised Keen that she had not received a return-to-work certification from her health-care provider, but that she had an appointment to receive such a certification on January 3, 2013. *See id.*, Exh. 32. Keen extended Carrion's leave through January 4, 2013. *See id.*

Page 19 - FINDINGS AND RECOMMENDATION

On January 3, 2013, Carrion's health-care provider sent Keen a note indicating that Carrion required an indefinite leave of absence from work. *See id.; see also* Russell Decl., Exh. B at KEEN000941. On January 7, 2013, Keen requested that Carrion seek a second opinion from a physician of its choice. *See* Naylor Depo., Exh. 32; *see also* Russell Decl., Exh. B at KEEN000941. That same day, Carrion's counsel wrote to Keen agreeing to seek a second opinion but reiterating that Carrion intended to return to work as Keen's Talent Manager. *See* Naylor Depo., Exh. 30; *see also* Russell Decl., Exh. B at KEEN000941. On January 18, 2013, Carrion's health-care provider sent Keen a note stating that Carrion's leave would extend for an additional two weeks from an unspecified date. *See* Decl., Exh. B at KEEN000941.

On January 20, 2013, Keen's new in-house counsel, Timothy Naylor, responded to Carrion's counsel's letter of January 7, 2013, adopting the position that Carrion's counsel had suggested that Carrion might intend to resign from Keen's employ. *See* Naylor Depo., Exh. 32. Naylor indicated that in the event Carrion did not elect to resign, Keen was "ready" for her to return to the Human Resources Manager position, and reiterated that her return to work would be conditioned on a certification of her fitness for the Human Resources Manager duties. *Id.* On January 28, 2013, Carrion's counsel advised Keen that Carrion had attempted without success to make an appointment with Keen's chosen physician. *See also* Russell Decl., Exh. B at KEEN000941.

At some time in January 2013, Traci Reandeau was hired to fill the role of Keen's Director of Human Resources – effectively the same position as the Senior Human Resources Manager – on a temporary basis. Declaration of Traci Reandeau ("Reandeau Decl."), ¶ 2. At that time, Reandeau "was informed" that Carrion was one of two human resources employees at

Page 20 - FINDINGS AND RECOMMENDATION

Keen, and that Carrion's position was that of either a Human Resources Manager or a human resources generalist. *Id.* at ¶¶ 3-4. Reandeau testifies that the job position "Talent Manager" never existed during her own tenure at Keen and that "to [her] knowledge" it never existed at Keen prior to January 2013. *Id.* at ¶ 6. Reandeau further testifies that as of early 2013 there was no "Talent Manager" position in existence for Carrion to return to should her leave of absence end. *See id.*

On February 1, 2013, Carrion requested that Keen cease communicating with her through her counsel. *See* Russell Decl., Exh. B at KEEN000942.

On February 26, 2013, Carrion provided Keen with a release for return to work in the Talent Manager position beginning March 1, 2013, with the recommendation that she be permitted to work from home two days per week, from her own medical care provider. *See id.* at KEEN000942. Naylor refused to accept the certification of fitness, affected to construe Carrion's proffer of the certification as her resignation from Keen's employ effective March 1, 2013, but nevertheless extended Carrion's leave through March 7, 2013, once again conditioning her return to work as of March 8, 2013, on Carrion's provision of a certification of fitness to return to the duties of a Human Resources Manager from Keen's chosen physician. *See id.* On February 28, 2013, Carrion protested Naylor's condition, characterizing it as "100% contrary to Oregon law" and asserting that Keen had no right to require a second opinion regarding her fitness to return to work. Russell Decl., Exh. B at KEEN000939.

On March 1, 2013, Naylor wrote to Carrion, ignoring Carrion's settlement offer and again reiterating Keen's position that it was ready for her to return to work on March 8, 2013, conditioned on receipt of Keen's chosen physician's certification of her fitness to return to the

Human Resources Manager position. *See id.* at KEEN000938. That same day, Carrion wrote to Naylor, inquiring as to the reason the qualified certification for return to duty she had provided on February 26, 2013, was insufficient to meet Keen's needs. *See id.* at KEEN000937. Also on that same day, Naylor replied that the previously provided certification was insufficient as it related to the wrong job position and did not release her to "full duty in the HR manager role." *Id.* Also that same day, Carrion responded to Naylor to object that she had been in the Talent Manager position rather than the Human Resources Manager position at the time she went on leave. *See id.* at KEEN000936.

On March 3, 2013, having received no response to her most recent message to Naylor, Carrion advised Naylor that she intended to return to work the following day to "full duty" in the position of Talent Manager. *Id.* at KEEN000935. Naylor responded that same day to reiterate that Carrion would not be permitted to return to work absent a certification of fitness to return to the Human Resources Manager job duties from Keen's chosen provider. *See id.* That same day, Carrion responded that, in light of Naylor's message, she would not return to work the following day although she had been released to return to the full duties of a Talent Manager. *See id.* Also that same day, Hartman advised Carrion in response to her most recent message to Naylor that Keen would accept a certification of Carrion's fitness to return to the full duties of a Human Resources Manager from any health-care provider, and that it would not require that Carrion receive such a certification from its own chosen physician. *See id.* at KEEN000934. On March 4, 2013, Carrion responded to Hartman's message, reiterating her position that she had been Keen's Talent Manager when she went on leave. *See id.* at KEEN000932. Carrion advised Hartman that she would file a claim with the Oregon Bureau of Labor and Industries, Civil

Rights Division ("BOLI"), regarding Keen's possible violation of her rights to protected medical leave. *See id.* at KEEN000933.

On March 6, 2013, Carrion wrote to Hartman to advise her that she had once again unsuccessfully attempted to make an appointment with Keen's chosen physician. *See id.* at KEEN000931-KEEN000932. On March 7, 2013, Hartman responded to Carrion's message to inquire whether Carrion intended to submit a certification of fitness to return to duty as Keen's Human Resources Manager. *See id.* at KEEN000931. That same day, Carrion responded to Hartman, stating that Keen was making it impossible for her to return to work by requiring her to obtain a fitness certification from Keen's chosen physician, with whom it was impossible for her to make an appointment. *See id.* That same day, Hartman responded that the issue was not the identity of the physician but the duties to which Carrion was or was not fit to return. *See id.* at KEEN000930. That same day, Carrion responded to Hartman, asking whether it was Keen's position that if Carrion would not agree that she had been in the Human Resources Manager position at the time she went on leave she would not be permitted to return from protective medical leave. *See* Carrion Depo., 44:4-7; *id.*, Exh. 44 at 20.

On March 8, 2013, Carrion sent several email messages to Hartman and Naylor requesting a response to her inquiry, as well as email messages to Keen's HR personnel, including Outlaw, requesting verification that she had served Keen as its Talent Manager at the time she went on leave. *See id.* Late that same day, Naylor sent Carrion an email message with a letter styled as an "Exit Letter" attached. *See id.* at 21. The exit letter indicated that Keen would construe Carrion's refusal to return to work as its Human Resources Manager as her resignation from its employ. *See id.* It appears uncontested that both parties understand Carrion's receipt of

the exit letter as marking the termination of her employment.

In June 2013, Reandeau hired Brent de Saxe to serve as Keen's Senior Recruiting Manager, a position which appears to be a very close equivalent to the Talent Manager position envisioned by Keen management during their discussions of the first half of 2012. *See* Reandeau Decl., ¶ 5.

Prior to filing this action, Carrion filed charges of unlawful employment practices with the Oregon Bureau of Labor and Industries, Civil Rights Division and complaints with the Equal Employment Opportunity Commission in satisfaction of the administrative prerequisites to filing employment discrimination claims. This action was filed March 20, 2014.

Although Keen "typically" issued a "Payroll Information Form" whenever a Keen employee changed jobs at Keen, Declaration of Nicole Sullivan ("Sullivan Decl."), ¶ 3, *see also* Carrion Depo., 28:6-22, as of July 23, 2015, Keen's internal records did not reflect that any such form ever issued in connection with Carrion's employment at Keen at any time during the tenure of her employment there, *see* Sullivan Decl. ¶¶ 4-5. Moreover, as of July 23, 2015, Carrion's "job information history" in Keen's human resources and payroll software, which "lists all positions she held at Keen," stated "only that she was HR Manager" and listed no other job titles. *See id.*, ¶ 5. However, Outlaw testifies that Keen's human resources and payroll software could fail to reflect changes that actually occurred if the changes were not properly entered into the software. *See* Outlaw Depo., 46:13-24.

III.    **The Parties' Evidentiary Disputes**

   A.    **The Parties' Evidentiary Dispute Regarding Carrion's Job Title/Duties as of the Date of the Callan Termination, the Date She Went on Protected Medical Leave, and/or the Date She Threatened to File a BOLI Complaint**

Keen acknowledges the body of evidence presented by Carrion in support of her position

that as of approximately the beginning of October 2012 (and thereafter through the end of her

employment) she held the position of Talent Manager, but argues that nevertheless a finder of

fact could not reasonably conclude on the basis of the evidentiary record that Carrion ever held

any job position other than that of its Human Resources Manager.  For the following reasons, I

disagree and find to the contrary that, for purposes of Keen's motion for partial summary

judgment, this court must resolve the parties' evidentiary dispute in Carrion's favor and assume

that at all material times from approximately the beginning of October 2012 through the date she

went on protected medical leave Carrion served as Keen's Talent Manager.[3]

Keen argues, first, that notwithstanding Carrion's evidentiary proffer a finder of fact could

not reasonably conclude that Carrion was ever made Keen's Talent Manager because (i) her offer

letter extended an offer to become its Human Resources Manager, (ii) the offer letter constituted

"the complete and exclusive statement of the parties' "Employment Agreement," (iii) the offer

letter contained a provision stating that the parties' Employment Agreement could not be changed

other than by a writing signed by Carrion and an authorized Keen officer, such that any change in

Carrion's job duties or job title would have required such a writing, and (iv) no such writing was

---

[3] I emphasize that my recommendation that the court find that Carrion served at material times as Keen's Talent Manager is made solely for the purpose of analyzing the merits of Keen's motion for partial summary judgment.  The questions of whether Carrion was moved to the Talent Manager position, and, if so, of how long she served in that position and what job duties she owed to Keen while serving in that position, will ultimately be resolved by a trier of fact.

Page 25 - FINDINGS AND RECOMMENDATION

ever signed. Keen's interpretation of the parties' Employment Agreement is contrary to its plain language. As noted above, and as Keen observes, the offer letter does contain the following provision reflecting that the terms and conditions of Carrion's employment as set forth in the offer letter could not be changed other than through a signed writing:

> This letter forms the complete and exclusive statement of [Carrion's] employment agreement with KEEN (hereinafter Employment Agreement). The Employment Agreement terms set forth in this letter supersede any other agreements or promises made to [Carrion] by anyone, whether oral or written. This Employment Agreement cannot be changed except in a writing signed by [Carrion] and a duly authorized officer of [Keen].

Carrion Depo., Exh. 42. However, among the terms of the parties' Employment Agreement that could not be changed other than by a signed writing was a term providing that, by express contrast with the at-will nature of Carrion's employment (which could not be changed other than by a signed writing), Carrion's "job duties, title, compensation, [and] benefits . . . may change from time to time." *Id.* Properly construed, the parties' Employment Agreement establishes that changes in Carrion's job title and job duties could be effected without a signed writing, with the consequence that the absence of such a writing is necessarily without probative value as to the question whether Carrion's job title and job duties changed during the tenure of her employment at Keen.[4]

---

[4] Keen urges the court to construe the provisions of the offer letter as permitting Keen to change Carrion's job title and job duties "from time to time," but only where such changes would not fundamentally alter the nature of the job she was offered, namely that of Human Resources Manager. That is, Keen urges the court to construe the provision permitting such changes without a signed writing as permitting only changes that would merely rename the position of Human Resources Manager or make minor changes to the job duties associated specifically with the Human Resources Manager position. Even under that construction, however, a signed writing would not have been required to effect the changes in Carrion's job duties at issue here, because the position of Talent Manager remains, like the Human Resources Manager position, a managerial human resources job, with job duties substantially overlapping those of the Human

Keen argues, second, that notwithstanding Carrion's evidentiary proffer a finder of fact could not reasonably conclude that Carrion was ever made Keen's Talent Manager because Carrion testified in deposition that when a Keen employee changed jobs, a form was filled out and a letter issued to the employee to congratulate the employee in connection with the change, *see id.*, 27:25 – 29:17, and because Carrion further testified that she did not recall any announcement being made by Keen of the change in her position other than Corbin's announcement of the change to Keen management during the course of a retreat, *see id.*, 35:19 – 36:6. In further support of this same argument, Keen offers the testimony of Sullivan that Keen "typically" issued a "Payroll Information Form" whenever a Keen employee changed jobs at Keen, Sullivan Decl., ¶ 3, that as of July 23, 2015, Keen's internal records did not reflect that any such form ever issued in connection with Carrion's employment at Keen at any time during the tenure of her employment there, *see id.*, ¶¶ 4-5, and that as of July 23, 2015, Carrion's "job information history" in Keen's human resources and payroll software, which "lists all positions she held at Keen," stated "only that she was HR Manager" and listed no other job titles. *See id.*, ¶ 5. In further support and to similar effect, Keen offers Reandeau's declaration testimony that when she began working at Keen in January 2013 she "was informed" that Carrion was one of two human resources employees at Keen, Reandeau Decl., ¶¶ 2-3, that "to [her] knowledge" Carrion always worked for Keen as either a Human Resources Manager or a human resources generalist, *id.*, ¶ 4, that during her tenure at Keen's parent Keen never had a "Talent Manager"

Resources Manager. Moreover, even if the terms of the offer letter were construed as inherently ambiguous such that Keen's interpretation was construed as supported by the letter's plain language, in the absence of extrinsic evidence as to the parties' intended meaning, the constructive ambiguity would be resolved as a matter of Oregon law against Keen, the drafter of the offer letter. *See Hill v. Qwest (In re Hill)*, 178 Or. App. 137, 143 (2001).

position and to her knowledge never had any such position prior to her tenure, *see id.*, ¶ 6, and

that there was no Talent Manager position in existence for Carrion to "return" to following

Carrion's leave of absence from Keen, *see id.* Such evidence is certainly probative of the

question whether Carrion's job title and job duties ever changed during her tenure at Keen, but it

is hardly dispositive of the question, particularly in light of the fact that no evidence of record

suggests that a change in an employee's job title or job duties could never be effected in the

absence of a Payroll Information Form or a congratulatory letter, in light of Reandeau's lack of

personal knowledge of the matters to which she testifies, and in light of Outlaw's testimony that

Keen's human resources and payroll software could fail to reflect changes that actually occurred

if the changes were not properly entered into the software. *See* Outlaw Depo., 46:13-24. In

consequence, this evidence does not compel the conclusion that a finder of fact could not

reasonably conclude that Carrion's job title and job duties ever changed during the tenure of her

employment at Keen notwithstanding her testimony and that of Outlaw to the contrary.

Keen argues, third, that notwithstanding Carrion's evidentiary proffer a finder of fact

could not reasonably conclude that Carrion was ever made Keen's Talent Manager because

Carrion further testified in deposition that the change to the Talent Manager position entailed no

changes to her salary or benefits or to the other terms and conditions of her employment. *See*

Carrion Depo., 33:15-21. However, this testimony is by no means inconsistent with Carrion's

position: not every change in an employee's job title and job responsibilities is necessarily

accompanied by a change in salary or benefits, or in the other terms and conditions of the

employee's employment. Indeed, it is Carrion's express position that she began serving as Keen's

Talent Manager in or around late September or early October 2012 without any changes in the

terms and conditions of her employment other than in her job title and in the reduction of her

employment responsibilities. In consequence, Carrion's testimony regarding the absence of

changes to her salary and benefits and to the other terms and conditions of her employment

likewise does not compel the conclusion that a finder of fact could not reasonably conclude that

Carrion's job title and job duties ever changed during the tenure of her employment at Keen

notwithstanding her testimony and that of Outlaw to the contrary.[5]

Keen argues, fourth, that notwithstanding Carrion's evidentiary proffer a finder of fact

could not reasonably conclude that Carrion was ever made Keen's Talent Manager because when

in late June 2012 Corbin left a voice message for Carrion to advise her that she had spoken with

senior Keen management regarding the reorganization of the Keen human resources department,

Corbin made clear that the reorganization, which if effected was contemplated to include

Carrion's move to the Talent Manager position, was at that time only a proposal and had not yet

been effected. *See id.*, 68:16 – 70:9. In further support of this same argument, Keen offers

Corbin's testimony that when on June 26, 2012, Corbin sent Carrion an email message attaching

a draft job description for the Talent Manager position, she specified that the job description was

a non-final draft and characterized the reorganization of which the switch to Talent Manager was

a contemplated component as a "future" event. Corbin Decl., Exh. 9; Corbin Depo., Exh. 8.

---

[5] The same applies also to the evidence that, although Corbin "always" took notes of meetings she attended in her role as a human resources employee she took no notes of any meeting at which Corbin advised her that she had been moved to the Talent Manager position, *see* Carrion Depo., 44:19 – 45:17, and to the evidence that Carrion herself never announced the change in her position, *see id.*, 34:2-10. While such evidence may be somewhat probative of the question whether the change occurred, neither a lapse in Carrion's note-taking diligence nor a failure to issue a social media announcement is dispositive of the question whether Keen made Carrion its Talent Manager.

Page 29 - FINDINGS AND RECOMMENDATION

However, all such evidence is entirely consistent with Carrion's position that the reorganization was officially implemented in connection with the early October 2012 hire of Scott to fill the contemplated role of Senior Human Resources Manager, and thus had not yet been effected in June 2012. In consequence, the fact that the change had not yet been effected in June 2012 does not compel the conclusion that the change could not have been effected at any later date, and therefore likewise does not compel the conclusion that a finder of fact could not reasonably conclude that Carrion's job title and job duties ever changed during the tenure of her employment at Keen notwithstanding her testimony and that of Outlaw to the contrary.

Keen argues, fifth, that a finder of fact would be precluded from finding that Carrion's job title and responsibilities ever changed during the tenure of her employment at Keen because Carrion has at different times leading up to and during these proceedings asserted different theories as to the precise date upon which she became Keen's Talent Manager, including April 2012 (when Corbin told her she would be well suited for the Talent Manager role), June 2012 (when Keen management expressed itself willing in principle to effect the change), August 2012 (when Keen's board of directors discussed the possibility of effecting the change and Corbin approved new business cards for Carrion bearing the title "Talent Manager"), September 2012 (when Keen was poised to hire Scott as its Senior Human Resources Manager), and October 2012 (when Keen actually did hire Scott to fill that role). However, although the record establishes that Carrion has indeed advanced each of those dates as the date her role shifted to that of Talent Manager, it has always been only her legal conclusion and/or legal theory, or perhaps her subjective understanding, that has changed over time, and not her version of the objective underlying events, which has remained consistent. The evolution of Carrion's theory as

to precisely when she first took on the role of Keen's Talent Manager therefore provides no

grounds for concluding that a finder of fact would be unable reasonably to conclude that

Carrion's job title and job duties ever changed during the tenure of her employment at Keen.

Analysis of the parties' evidentiary proffers establishes the existence of no actual or

potential material dispute of fact regarding the events at issue at any time from the inception of

Carrion's employment through August 2012, when Carrion asked for Corbin's approval of new

business cards bearing the title "Talent Manager." The evidence of record includes email

correspondence between Carrion and Corbin dated August 23, 2012, authenticated by Corbin

herself, in which Carrion expressly asked "Should I have the new tit[]le on these Business

Cards?" and Corbin replied with the single word "Yes." Corbin Decl., Exh. 12. Corbin

represents by and through her declaration testimony that "[a]t the time, [she] had not approved

any change to Ms. Carrion's title," and suggests (without expressly so declaring) that, rather than

flatly approve business cards reflecting the change in Carrion's title she left the matter open for

further discussion which did not occur. Corbin Decl., ¶ 31. To the extent the parties' proffers

may be in conflict on this point, this court must resolve the conflict for purposes of the motion

now before the court in Carrion's favor, and find that on August 23, 2012, Corbin approved new

business cards for Carrion bearing the title "Talent Manager." That evidence is probative and

tends to suggest that Corbin may in fact have approved the change to Carrion's title on or before

that date, but is also equivocal, in that on the same day and in the course of the same discussion,

Corbin refers to making the change "through an ECS," suggesting that although Corbin

apparently thought the change was sufficiently likely to occur that new business cards could be

justified, the change had not yet actually been effected. The equivocal nature of the evidence is

Page 31 - FINDINGS AND RECOMMENDATION

highlighted by the fact that on September 16, 2012, Corbin sent Fuerst an email message reiterating Corbin's belief that Keen still needed to fill the Talent Manager position, either with Carrion or with another candidate, *see* Fuerst Depo., Exh. 4, suggesting that as of September 16, 2012, Corbin continued to believe that she had not yet moved Carrion into the position.

The court need not decide whether a finder of fact could reasonably conclude on the basis of Corbin's approval of new business cards alone that Carrion was moved to the position of Talent Manager, because the parties' evidentiary proffers are in clear conflict as to whether the move was or was not affirmatively effected in connection with Keen's hire of Scott to serve as Keen's Senior Human Resources Manager in approximately late September or early October 2012. Keen offers Corbin's unequivocal testimony that at all times in and prior to December 2012 (when she left the employ of Keen's parent company), "Carrion held only one job title: HR manager" and that to the best of Corbin's knowledge "she never held any other titles at KEEN," Corbin Decl., ¶ 5, and that Corbin "would have had to approve any change to [Carrion's] job title" but "never approved [such] a change" or "approve[d] any paperwork confirming [such] a change," *id.* at ¶ 33. In direct contradiction of Corbin's testimony, Carrion offers her own testimony and that of Outlaw that Corbin expressly advised both Carrion and Outlaw that in connection with Scott's hire Carrion was moved into the Talent Manager position, *see* Carrion Depo., 30:23 – 31:3, 72:1 – 73:4, Outlaw Depo., 15:13-16, 33:12 – 34:25, 37:10-13, 45:22-24, 54:12-15, and moreover offers her own testimony that Corbin made the same announcement to Keen executives at their retreat, *see See* Carrion Depo., 30:15-22, 40:10 – 41:1, 72:3-18, and that after Corbin did so, Keen executive Hill congratulated Carrion on the move, *see id.* 44:4-7, *id.*, Exh. 44 at 4. At this stage of these proceedings, and for purposes of the motion now before the

court, this court must resolve this evidentiary conflict in Carrion's favor, and find that in or around late September or early October 2012, Keen made Carrion its Talent Manager.[6]  In light of Carrion's and Outlaw's testimony that neither of them was ever advised that Carrion's role had reverted to that of Human Resources Manager, *see* Carrion Depo. 112:4-8, 112:18-23, 113:19-20, Outlaw Depo. 15:16-19, 123:2-6, and the absence of evidence suggesting to the contrary, this court should further find for purposes of the motion now before the court that Carrion continued to serve as Keen's Talent Manager up to and through the date she went on medical leave from Keen's employ.

Finally, the foregoing conclusions are not disturbed by Keen's evidence that from November 15, 2012, through the effective date of Carrion's termination Keen consistently took the position in its communications with Carrion and with Outlaw that Carrion had at all times during the tenure of her employment served as Keen's Human Resources Manager.  It is undisputed that on November 5, 2012, Fuerst, Smith, and Corbin discussed the option of terminating Carrion's employment, but ultimately decided to issue a write-up or corrective action rather than terminate her, at least in part on the theory that Carrion might resign if presented with a sufficiently strongly worded corrective action, obviating the need for affirmative termination. *See* Fuerst Depo., Exh. 2.  In light of Keen's interest in obtaining Carrion's resignation beginning not later than November 5, 2012, it is consistent with Carrion's theory of her case (although I do not so find) that Keen executives might misrepresent her job title and duties in the belief that to

---

[6]  In light of Corbin's testimony that her approval was required to effect a change in Carrion's job title and job duties, *see* Corbin Decl., ¶ 33, a finder of fact could reasonably conclude that Corbin's communications to Carrion and Outlaw and to the Keen executives were sufficient to effect the change.

Page 33 - FINDINGS AND RECOMMENDATION

do so might make it easier to procure her termination, either through the FMLA/OFLA return-to-work process or through characterizing her refusal to effect the Callan termination and her threat to bring a BOLI action against Keen as within the scope of her job duties as a Human Resources Manager.

For the foregoing reasons, the court should find for purposes of Keen's partially dispositive motion that Carrion served as Keen's Talent Manger from approximately October 1, 2012, through the date her employment terminated, and moreover that her job duties in that position did not include employee discipline or termination and did not include any catch-all responsibility for "other duties as assigned," but rather included only responsibilities relating to the recruitment of new employees and the training and development of current employees.

**B.    The Parties' Evidentiary Dispute Regarding the Degree and Nature of Carrion's Refusal to Participate in the Callan Termination**

As noted above, the parties' evidentiary proffers are in conflict as to what occurred after Corbin advised Carrion that Keen had decided to effect Callan's termination in November 2012. It is Carrion's testimony that Corbin "asked [her], 'Are you comfortable doing the termination?'" and that she replied that she was not, because she was no longer the Human Resources Manager and because she believed the proposed termination of Callan's employment would be retaliatory and unlawful. *See* Carrion Depo., 81:18 – 82:9. Carrion testifies that she offered to serve as a witness to the termination, but expressed discomfort with having any greater involvement in effecting the termination. *See id.* By contrast, it is Corbin's testimony that all she asked was for Carrion to be present as a witness while Hill effected the termination, and that Carrion refused to assist in the termination to even that extent. *See* Corbin Decl., ¶ 18. The parties are in agreement

that Hill effected the Callan termination with Corbin present telephonically, and without

Carrion's presence or direct involvement, *see* Carrion Depo., 83:25 – 84:25, Corbin Decl., ¶ 19,

notwithstanding the assertion made in the Corrective Action notice of November 15, 2012, that

Corbin flew to Portland for the sole purpose of being present for the termination, *see* Carrion

Depo., Exh. 49, Corbin Decl. Exh. 6.

Again, for purposes of analyzing the merits of the motion now before the court, this court

must resolve the parties' evidentiary dispute in Carrion's favor. The court should therefore find

for purposes of Keen's partially dispositive motion that Carrion's account of the events

surrounding her refusal to participate fully in the Callan termination is accurate.

## ANALYSIS

As noted above, by and through its motion now before the court, Keen seeks summary

adjudication in its favor of Carrion's first (opposition retaliation), third (failure to restore), and

fourth (whistle-blower retaliation) claims for relief, and of a portion of Carrion's fifth (wrongful

discharge) claim for relief. Because effectively identical legal frameworks govern Carrion's two

retaliation claims – the first of which, for opposition retaliation, is brought pursuant to both

federal and Oregon law, and the second of which, for whistle-blower retaliation, is brought

pursuant to state law only – I address the parties' arguments regarding those two claims together.

## I.     Carrion's Retaliation Claims

Carrion alleges Keen's liability under both federal and state law for opposition retaliation,

on the theory that the termination of her employment was motivated by retaliatory animus for

Carrion's conduct in refusing to participate in the Callan termination as directed by Corbin. In a

separately pled claim, Carrion alleges Keen's liability for whistle-blower retaliation under state

law, on the theory that the termination of her employment was motivated by retaliatory animus for Carrion's conduct in filing an internal written complaint on or around November 19, 2012, that Keen had unlawfully discriminated against her and invaded her privacy, in complaining to Naylor on February 28, 2013, that Keen's conduct in placing conditions on her return to work was unlawful, and in threatening to Naylor and Hartman on March 4, 2013, that she would file a BOLI complaint regarding Keen's possible violation of her rights to protected medical leave.

The courts of the Ninth Circuit "apply a system of shifting burdens in Title VII . . . retaliation cases." *Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1140 (9th Cir. 2001), *citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-803 (1973); *see also Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987). "In order to make out a *prima facie* case of retaliation, a plaintiff must show that (1) she was engaging in protected activity, (2) the employer subjected her to an adverse employment decision, and (3) there was a causal link between the protected activity and the employer's action." *Bergene*, 272 F.3d at 1140-1441, *citing Folkerson v. Circus Circus Enters., Inc.*, 107 F.3d 754, 755 (9th Cir. 1997). For retaliatory conduct to be actionable under Title VII, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (citation, internal quotation marks omitted). In the event the plaintiff makes out a *prima facie* case of retaliation, the burden shifts to the employer defendant to produce evidence that the adverse employment decision was made for a legitimate, non-retaliatory reason. *See Bergene*, 272 F.3d at 1441, *citing Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-254 (1981).

in the event the employer defendant succeeds in proffering evidence sufficient to meet that

burden, the burden shifts back to the plaintiff to establish that the employer defendant's proffered

reason for its complained of conduct was a pretext for retaliation. *See id.*, *citing Godwin v. Hunt*

*Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998).

      Oregon law is to largely the same effect. Oregon law prohibits employers from

discharging or otherwise discriminating against any employee for opposing any unlawful practice

(opposition retaliation):

> (1)     It is an unlawful employment practice:
>
>          \* \* \*
>
>      (f)     For any person to discharge, expel or otherwise discriminate
> against any other person because that other person has opposed any
> unlawful practice, or because that other person has filed a
> complaint, testified or assisted in any proceeding under this chapter
> or has attempted to do so.

Or. Rev. Stat. 659A.030(1). Oregon law similarly prohibits employers from discharging or

otherwise discriminating against employees for reporting the employers' unlawful conduct

(whistle-blower retaliation):

> It is an unlawful employment practice for an employer to discharge, demote,
> suspend or in any manner discriminate or retaliate against an employee with
> regard to promotion, compensation or other terms, conditions or privileges of
> employment for the reason that the employee has in good faith reported
> information that the employee believes is evidence of a violation of a state or
> federal law, rule or regulation.

Or. Rev. Stat. 659A.199. Similarly:

> It is an unlawful employment practice for an employer to discharge, demote,
> suspend or in any manner discriminate or retaliate against an employee with
> regard to promotion, compensation or other terms, conditions or privileges of
> employment for the reason that the employee has in good faith reported criminal

> activity by any person, has in good faith caused a complainant's information or
> complaint to be filed against any person, has in good faith cooperated with any
> law enforcement agency conducting a criminal investigation, has in good faith
> brought a civil proceeding against an employer or has testified in good faith at a
> civil proceeding or criminal trial.

Or. Rev. Stat. 659A.230. When sitting in diversity, the courts of the Ninth Circuit analyze claims brought pursuant to Section 559A.030 and 659A.199 under the same *McDonnell Douglas* burden-shifting framework applicable to Title VII discrimination and retaliation claims. *See Dawson v. Entek Int'l*, 630 F.3d 928, 935 (9th Cir. 2011).

Here, to the extent it addresses Carrion's retaliation claims, Keen's motion is premised primarily on the theory that Carrion cannot establish a *prima facie* claim of either opposition or whistle-blower retaliation because she did not at any material time engage in protected activity. In the alternative, Keen takes the position that Carrion cannot establish a *prima facie* claim of either opposition or whistle-blower retaliation because she cannot establish a causal connection between her purported protected activity and her termination. Finally, in the further alternative, Keen argues that Carrion has not adduced evidence on the basis of which a finder of fact could reasonably conclude that Keen's proffered ground for her termination was pretextual. For the following reasons, the court should grant Keen's motion as to Carrion's whistle-blower-retaliation claim to the extent premised on Keen's violation of Or. Rev. Stat. 659A.230 and otherwise deny the motion as to each of the two retaliation claims.

### A.    Protected Activity

#### 1.    Carrion's Opposition Conduct *qua* Protected Activity

As noted above, Carrion's opposition-retaliation claim is premised on the theory that Carrion's termination was motivated by retaliatory animus for Carrion's conduct in refusing to

Page 38 - FINDINGS AND RECOMMENDATION

participate in the Callan termination on November 5, 2012, in the manner directed by Corbin. In support of its primary argument against Carrion's opposition-retaliation claim, Keen relies on Judge King's decision in *Clemons v. Nike, Inc.*, Case No. 06-1209-KI, 2007 U.S. Dist. LEXIS 73236 (D. Or. Sep. 28, 2007), on the cases relied upon by Judge King therein, and on a handful of cases with similar holdings.

      *Clemons* stands for the proposition that, where an employee's job responsibilities include advising the employer regarding employment-law compliance issues, reporting the possibility of the employer's noncompliance with applicable employment law in connection with its conduct regarding another employee does not constitute protected activity unless the employee steps outside the normal role of an employee in that employee's job position to take a position adverse to the employer. *See Clemons*, 2007 U.S. Dist. LEXIS 73236 at *23-26. In support of that proposition, *Clemons* relied in part on the Ninth Circuit's decision in *Nelson v. Pima Community College*, 83 F.3d 1075 (9th Cir. 1996), in which the court affirmed a defense summary judgment as to a Title VII retaliation claim premised on the theory that the employer college terminated an employee serving as its Assistant to the President for Affirmative Action and Equal Employment Opportunity for purportedly opposing the operation of the employer's affirmative action plan. The *Nelson* employee had demanded that the president of the employer college give her extraordinary powers over faculty hiring decisions, and in response the president had refused that demand and issued "'instructions' and 'clarifications' making it crystal clear that [the employee] was to work for him as staff, and did not have any independent authority to act on her own. He wrote that failure to adhere to the 'directives' in the letter would be considered 'insubordination.'" *Nelson*, 83 F.3d at 1078. The conduct purportedly constituting opposition to the employer's

Page 39 - FINDINGS AND RECOMMENDATION

affirmative action plan in *Nelson* was the employee's subsequent conduct in ordering that "all hiring [without her prior approval] be stopped" and in ordering a dean not to continue using the college's affirmative action process and not to hire a professor selected through that process, in each case without authority for so ordering from the president or his office. *Id.* at 1079. The *Nelson* court assumed without deciding both that opposition to an affirmative action plan could constitute protected activity for purposes of a Title VII retaliation claim and that the employee's unauthorized orders could constitute such opposition. *See id.* at 1082. Proceeding on those assumptions, the court quoted with approval a decision of the Sixth Circuit holding that "an employee does not receive special protection under Title VII simply because the employee handles discrimination complaints or works on affirmative action matters. 42 U.S.C. § 2000e-3(a) does not prevent an employer from dismissing an employee who handles discrimination complaints as part of h[er] job when the employee handles these complaints [in a manner] contrary to the instructions of h[er] employer." *Id.* (internal modifications omitted), *quoting Holden v. Owens-Illinois, Inc.*, 793 F.2d 745, 751 (6th Cir. 1986). The *Nelson* court additionally quoted a previous Ninth Circuit decision for the proposition that "a college or university affirmative action officer is 'not . . . a private attorney general but [rather] a company executive. The position [i]s unique in that it require[s] the occupant to act *on behalf of* h[er] employer in an area where normally action against the employer and on behalf of the employees is protected activity.'" *Id.* (emphasis original), *quoting Smith v. Singer Co.*, 650 F.2d 214, 217 (9th Cir. 1981) (expressly observing that, due to the uniqueness of the affirmative action officer role, the court's "holding here is an extremely narrow one, applying only to the EEO officer

appointed under the executive orders and regulations here involved").[7]  Based on its finding that

insubordinately disobeying reasonable employer direction was the motivation of the college

employer's complained-of conduct in terminating the employee rather than the opposition to the

employer's conduct that purportedly motivated the insubordinate disobedience, the *Nelson* court

found that the adverse employment action taken against the employee was not "'because' of her

criticism" with the consequence that the employer was entitled to summary judgment of the

retaliation claim.  *Id.*

In further support of its holding, *Clemons* relied in significant part on the Tenth Circuit's

decision in *McKenzie v. Renberg's Inc.*, 94 F.3d 1478 (10th Cir. 1996), in which the court found

that, for purposes of the Fair Labor Standards Act (the "FLSA"), "an employee is [not] insulated

from retaliation for participating in activities which are neither adverse to the company nor

supportive of adverse rights under the statute which are asserted against the company" but rather

engages in protected activity only through "the assertion of statutory rights (*i.e.*, the *advocacy* of

rights) by taking some action adverse to the company--whether via formal complaint, providing

testimony in an FLSA proceeding, complaining to superiors about inadequate pay, or otherwise."

*McKenzie*, 94 F.3d at 1486 (emphasis original).  The *McKenzie* court reasoned as follows:

> Here, [the employee] never crossed the line from being an employee merely
> performing her job as personnel director to an employee lodging a personal
> complaint about the wage and hour practices of her employer and *asserting* a right
> adverse to the company.  [The employee] did not initiate a FLSA claim against the

---

[7]  Notwithstanding the *Smith* court's express restriction of its holding to its own unique
facts, and notwithstanding that in *Wrighten v. Metropolitan Hospitals, Inc.*, 726 F.2d 1346, 1356
n. 6 (9th Cir. 1984), the Ninth Circuit construed the *Smith* holding as restricted to its facts, in *Unt
v. Aerospace Corp.*, 765 F.2d 1440 (9th Cir. 1985), the Ninth Circuit cited *Smith* in support of
the proposition that "[a]n employee is not protected by Title VII when [s]he . . . knowingly
disobeys company orders. . . ."  *Unt*, 765 F.2d at 1446.

Page 41 - FINDINGS AND RECOMMENDATION

company on her own behalf or on behalf of anyone else.  Rather, in her capacity as personnel manager, she informed the company that it was at risk of claims that might be instituted by others as a result of its alleged FLSA violations.  **In order to engage in protected activity under [the FLSA], the employee must step outside his or her role of representing the company and either file (or threaten to file) an action adverse to the employer, actively assist other employees in asserting FLSA rights, or otherwise engage in activities that reasonably could be perceived as directed towards the assertion of rights protected by the FLSA.**

*Id.* at 1486-1487 (footnote omitted; italicized emphasis original; bolded emphasis supplied).

In addition to *Clemons*, Keen expressly relies on *Nelson*, *Smith*, and *McKenzie* in support of its argument, and further expressly relies on the Fifth Circuit's unpublished disposition in *Lasater v. Tex. A&M Univ. Commerce*, 495 Fed. Appx. 458 (5th Cir. Tex. 2012), which stands for the proposition that:

> **an employee's communication does not constitute a complaint unless that employee somehow steps outside of h[er] normal job role so as to make clear to the employer that the employee is taking a position adverse to the employer.**  Such a requirement is eminently sensible for management employees because a managerial position necessarily involves being mindful of the needs and concerns of both sides and appropriately expressing them.  Thus, voicing concerns is not only *not adverse* to the company's interests, it is exactly what the company expects of a manager.  Without such a requirement, nearly every activity in the normal course of a manager's job would be protected activity.

*Lasater*, 495 Fed. Appx. at 461-462 (citations, internal quotation marks omitted; italicized emphasis original; bolded emphasis supplied) (unpublished disposition).  Keen further expressly relies on the Second Circuit's inapposite decision in *Ruotolo v. City of New York*, 514 F.3d 184 (2d Cir. 2008), which stands for the proposition that where an employee files a lawsuit against his or her employer for the redress of personal grievances, such a lawsuit does not rise to the level of a matter of public concern such that the protections of the First Amendment against employer retaliation for filing the lawsuit would be triggered.  *See Ruotolo*, 514 F.3d at 188-190.

Page 42 - FINDINGS AND RECOMMENDATION

I note a tension between the holding and reasoning of the Ninth Circuit in *Nelson* and the holding and reasoning of the Fifth and Tenth Circuits in *McKenzie* and *Lasater*, specifically between the *Nelson* court's suggestion that when a human resources employee steps outside his or her normal job role to oppose the employer's course of conduct that employee's actions are unprotected for Title VII opposition-retaliation purposes, and the holdings of *McKenzie* and *Lasater* that such an employee's actions are protected only when the employee steps outside his or her normal job role to take a position clearly adverse to the employer. This court need not resolve that tension, however, and need not determine whether the Ninth Circuit would find that Carrion's conduct in opposition to the Callan termination could have been protected for Title VII opposition-retaliation purposes on the assumption that Carrion's normal job duties included employee discipline and terminations and/or advising Keen as to employment law compliance matters, because, as noted above, for purposes of the motion now before the court the court must assume that Carrion was Keen's Talent Manager at the time her opposition to the Callan termination was expressed, and that in that position effecting employee discipline/termination and providing advice regarding employment law compliance were not among her job duties. Because Keen's argument that Carrion cannot establish a *prima facie* claim of opposition retaliation is premised entirely on the theory that Carrion was its Human Resources Manager at the time her opposition was expressed, Keen has not established entitlement to summary judgment in its favor as to Carrion's opposition-retaliation claim on the ground that she cannot establish that her conduct in opposition to what she believed was her employer's unlawful practice was protected.

2.      **Carrion's Whistle-Blowing Conduct** *qua* **Protected Activity**

As noted above, Carrion's whistle-blower-retaliation claim is premised on the theory that

the termination of her employment was motivated by retaliatory animus for Carrion's conduct in

internally reporting Keen's unlawful conduct (on November 19, 2012, and on February 28, 2013)

in violation of Or. Rev. Stat. 659A.199 and/or for Carrion's conduct in threatening to file a BOLI

complaint (on March 4, 2013) in violation of Or. Rev. Stat. 659A.230. In support of its primary

argument against Carrion's whistle-blower-retaliation claim, Keen asserts that an employee's

statement of intent to file a BOLI claim against her employer, as opposed to actually filing a civil

proceeding against the employer, is not protected activity for purposes of Or. Rev. Stat.

659A.230. Keen is correct: the protections of Section 659A.230 come into play only where an

employee has reported her employer's criminal activity, cooperated with a criminal investigation

against her employer, testified against her employer in a judicial proceeding, or actually initiated

civil proceedings against her employer, and are not triggered when an employee *threatens* to

bring an *administrative* action against her employer in connection with her employer's violation

of civil law. *See* Or. Rev. Stat. 659A.230; *see also Huber v. Or. Dep't of Educ.*, 235 Or. App.

230, 238 (2010); *Mantia v. Hanson*, 190 Or. App. 36, 41 n. 3 (2003). In consequence, Keen is

entitled to summary judgment in its favor as to Carrion's whistle-blower-retaliation claim to the

extent premised on Keen's violation of Section 659A.230.

Although it asserts that Carrion's whistle-blower-retaliation claim should be dismissed in

its entirety for lack of the requisite protected activity, Keen offers no argument that Carrion's

internal reports of unlawful conduct did not trigger the protections of Section 659A.199.

Moreover, it appears clear that Section 659A.199 was enacted specifically to provide protections

for just such employee whistle-blowing. *See* Or. Rev. Stat. 659A.199; *see also De Bay v. Wild Oats Mkt., Inc.*, 244 Or. App. 443, 451 n. 2 (2011). Keen has therefore not established entitlement to summary judgment in its favor as to Carrion's whistle-blower-retaliation claim to the extent that claim is premised on Keen's violation of Section 659A.199 on the ground that she cannot establish that her conduct in reporting what she believed were Keen's violations of applicable law was protected.

**B.    Causation**

Keen's causation argument is the same as to each of Carrion's two retaliation claims, namely that Carrion cannot establish a causal connection between either her refusal to participate in the Callan termination in the manner directed by Corbin (on November 5, 2012) or her internal reports that she believed Keen was in violation of applicable employment law (on November 19, 2012, and on February 28, 2013) and the termination of her employment (effective March 8, 2013) because of the intervening time between the protected conduct and the termination and because, on Keen's view, the evidence establishes that the sole cause of Carrion's termination was her refusal to accept reinstatement to the Human Resources Manager position.

Keen's argument regarding the intervening time between the protected activity and the termination is entirely unpersuasive. First, as to Carrion's refusal to participate in the Callan termination in the manner directed by Corbin, during very nearly the entire period of time between the protected conduct and the termination Carrion was out of the workplace on protected medical leave. Second, also as to Carrion's refusal to participate in the Callan termination in the manner directed by Corbin, the evidence establishes that Keen began discussing the possibility of either effecting Carrion's termination or inducing her resignation immediately after the protected

Page 45 - FINDINGS AND RECOMMENDATION

conduct occurred, lending support to Carrion's theory of causation. Third, as to Carrion's internal reports of employment law violations, that protected activity occurred after Carrion had applied for protected medical leave, and some of it occurred shortly before the termination became effective.

Keen's argument regarding Carrion's refusal to accept reinstatement is likewise unpersuasive, at least under the legal standard applicable at this stage of these proceedings. As noted above, for purposes of Keen's motion this court must assume that Carrion was in the Talent Manager position at the time she went on leave, and therefore that she was entitled to reinstatement to that position at the time she sought to return from leave. On that assumption, it would be incoherent to find that the cause of Carrion's termination was her failure to accept reinstatement to a different position.

In consequence of the foregoing, Keen has not established entitlement to summary judgment in its favor as to either of Carrion's retaliation claims on the ground that she cannot establish causation.

C.     Pretext

Keen's pretext argument is the same as to each of Carrion's two retaliation claims, namely that Carrion cannot establish that its proffered reason for ending her employment – her refusal to accept reinstatement to the Human Resources Manager position – was pretextual, because the evidence of record establishes that it was the sole ground for her termination. As discussed above, for purposes of Keen's motion this court must assume that Carrion was in the Talent Manager position at the time she went on leave, and therefore that she was entitled to reinstatement to that position at the time she sought to return from leave. Also as discussed

Page 46 - FINDINGS AND RECOMMENDATION

above, on that assumption, it would be incoherent to find that the cause of Carrion's termination was her failure to accept reinstatement to a different position. For that reason, Keen's pretext argument necessarily fails at this stage of these proceedings, and Keen has not established entitlement to summary judgment in its favor as to either of Carrion's retaliation claims on the ground that she cannot adduce evidence sufficient to support the reasonable conclusion that Keen's proffered ground for the termination of Carrion's employment was pretextual.

## II.    Carrion's Failure to Restore Claim

Carrion's failure to restore claim is premised on the theory that Keen violated the FMLA and OFLA by refusing to restore her to the position of Talent Manager when she sought to return from protected medical leave. Under the FMLA, employees are entitled to be restored to the position they held before taking protected leave or to an equivalent position without loss of pay and benefits. *See* 29 U.S.C. § 2614(a)(1); *see also Liu v. Amway Corp.*, 347 F.3d 1125, 1132 (9th Cir. 2003). The same is true under OFLA. *See Centennial Sch. Dist. No. 28J v. Oregon Bureau of Labor & Indus.*, 169 Ore. App. 489, 498-499 (2000).

Keen's argument that Carrion cannot prevail on her failure to restore claim is premised entirely on its theory that Carrion refused such restoration when she insisted on being returned to a Talent Manager position rather than a Human Resources Manager position. As discussed above, for purposes of Keen's motion this court must assume that Carrion was in the Talent Manager position at the time she went on leave, and therefore that she was entitled to reinstatement to that position at the time she sought to return from leave. In consequence, Keen's argument necessarily fails as a matter of law to establish its entitlement to summary judgment of

Page 47 - FINDINGS AND RECOMMENDATION

Carrion's failure to restore claim.[8]

## III.    Carrion's Wrongful Discharge Claim

Carrion's wrongful termination claim, which presumably is asserted in the alternative to her various statutory claims, is premised on the theory that her termination was motivated by: "her good faith opposition and resistance to defendant's violation of her medical leave rights; her right to contact the Oregon Bureau of Labor; and her right to restoration to her position of employment upon return from protected medical leave; and in violation of a duties [*sic*] imposed upon defendant by [unspecified] public policy." Complaint, ¶ 68. The tort of wrongful discharge was established in Oregon "to serve as a narrow exception to the at-will employment doctrine in certain limited circumstances where the courts have determined that the reasons for the discharge are so contrary to public policy that a remedy is necessary in order to deter such conduct." *Draper v. Astoria Sch. Dist. No. 1C*, 995 F. Supp. 1122, 1127 (D. Or. 1998), *citing Walsh v. Consol. Freightways, Inc.*, 278 Or. 347, 351-52, (1977); *Sheets v. Knight*, 308 Or. 220, 230-31, 779 P.2d 1000 (1989). "The elements of a wrongful discharge claim are simple: there must be a discharge, and that discharge must be wrongful." *Moustachetti v. Oregon*, 319 Or. 319, 325, 877 P.2d 66 (1994). Under Oregon law, two circumstances lead to wrongful discharge: "(1) discharge for exercising a job-related right of important public interest, and (2) discharge for complying with a public duty." *Draper*, 995 F. Supp. at 1127, *citing Sheets*, 308 Or. at 230-31).

---

[8] Moreover, to the extent Keen might argue that in the absence of a Talent Manager position, the Human Resources Manager position was in fact the closest available equivalent position, the evidence shows that Carrion was replaced by an employee who was given the title Senior Recruiting Manager – it is this position, and not the Human Resources Manager position, that would have been the reasonable equivalent to the Talent Manager position if the talent Manager position did not exist at the time Carrion sought to return from leave.

Examples of "exercising a job-related right" include "filing a workers' compensation claim" and "resisting sexual harassment." *Id.* (citations omitted).

Keen's argument for partial dismissal of Carrion's wrongful discharge claim is solely directed against the wrongful discharge claim to the extent premised on her threat to file a BOLI claim. Keen's argument is well taken: the Oregon courts do not recognize a cause of action for common-law wrongful discharge arising out of termination in retaliation for reporting unlawful conduct unless the report is made "to an[] entity or person with authority to take action to enforce the statutory duties that" the subsequently terminated employee contends were violated. *Roberts v. Or. Mut. Ins. Co.*, 242 Or. App. 474, 481 (2011) (citations omitted). In consequence, Keen is entitled to summary adjudication in its favor of Carrion's wrongful discharge claim to the extent that claim is premised on the theory that she was discharged in retaliation for her threat to file a BOLI complaint.

I note that common law wrongful discharge is an interstitial claim only, and that generally the Oregon courts will not "recognize an additional common law remedy for wrongful discharge . . . if existing remedies adequately protect the employment related right." *Carlson v. Crater Lake Lumber Co.*, 103 Or. App. 190, 193, 796 P.2d 1216 (1990). Due to Carrion's failure to allege any specific job-related right of important public interest that she exercised or public duty with which she complied other than those underlying her various statutory claims, there is ground for concern as to whether Carrion's cause of action for wrongful discharge could state a claim upon which relief could be granted. However, the merits of Carrion's wrongful discharge claim to the extent premised on bases other than her threat to file a BOLI complaint are not currently before the court on Keen's motion, and Carrion has not been put to the burden of establishing

evidentiary support for the claim to that extent. I therefore decline to recommend *sua sponte* dismissal of the wrongful discharge claim to the extent the claim survives Keen's motion for partial summary judgment.

## CONCLUSION

For the reasons set forth above, Keen's motion (#48) for partial summary judgment should be granted as to Carrion's fourth claim for relief (whistle-blower retaliation) to the extent premised on Keen's violation of Or. Rev. Stat. 659A.230 and as to Carrion's fifth claim for relief (wrongful discharge) to the extent premised on the theory that her discharge was motivated by retaliatory animus for Carrion's conduct in threatening to file a BOLI complaint, and should otherwise be denied.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 16th day of October, 2015.

Honorable Paul Papak
United States Magistrate Judge

Page 50 - FINDINGS AND RECOMMENDATION